## UNITED STATES v. LA SOCIETE FRANCAISE DE BIENFAISANCE MUTUELLE.

### No. 11029.

Circuit Court of Appeals, Ninth Circuit.
Dec. 3, 1945.
Rehearing Denied Jan. 2, 1946.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, and Paul S. McMahon, Sp. Assts. to Atty. Gen., and Leonard Sarner, Sp. Asst. to Atty. Gen. (Frank J. Hennessy, U. S. Atty., and Robert B. McMillan, Asst. U. S. Atty., both of San Francisco, Cal., of counsel), for appellant.

P. A. Bergerot and A. P. Dessouslavy, both of San Francisco, Cal., for appellee.

Before DENMAN, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

We have for consideration the question of whether appellee, La Societe Francaise de Bienfaisance Mutuelle, is exempt from social security taxes as a corporation organized and operated exclusively for charitable purposes within the meaning of § 811 (b) (8) of the Social Security Act, 42 U.S. C.A. § 1011(b) (8). The provision reads:

"(b) The term 'employment' means any service of whatever nature, performed within the United States by an employee for his employer, except—

\* \* \* \* \* \*

(8) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for

the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual. * * *"

Appellant contends that the district court erred in its judgment holding appellee's hospital enterprise within the exemption of that section and awarding appellee a repayment of social security taxes, because the record shows that a "part of the net earnings of . . . (the hospital) inures to the benefit of . . . individual" members of the appellee corporation, and that the hospital is not "operated exclusively" for charitable purposes.

In this opinion appellant will be referred to as the Government and appellee as the Society.

The Society operates a large general hospital in San Francisco to which the general public, as well as members, is admitted, a school for nurses, and a home for aged members.

Membership in the Society is limited to those "of French birth, or descendants of French or speaking French, sound in mind and in body, and less than 50 years old." Members pay an admission fee and monthly dues and in return receive medical treatment and hospital care gratuitously or at less than the normal cost charged nonmember paying patients admitted to the Society's hospital. Only members in good standing receive these privileges and if a member is six months in arrears on his dues he loses his privileges although some indigent members and their families may be treated free of charge at the discretion of the board of directors.

The Society in 1940 received a total income of $409,630.17; approximately 37% was received from fees paid by non-members for hospitalization and the balance was received from members' dues, admission fees charged members, fees charged members for hospitalization, dividends, interest, and rent on investments owned by the Society, and gifts and bequests to it. Disbursements exceeded receipts by approximately $2,900 in 1940 and had exceeded receipts by much larger sums in the three years preceding 1940.

In 1944 the total income of the Society was $680,448.56. Of this approximately 67% represented fees paid by non-members for hospitalization and the balance represented income from sources detailed hereinbefore. In 1944 receipts exceeded

disbursements by nearly $70,000. Net earnings are credited to a surplus depreciation fund which has been used for the improvement, enlargement and betterment of its plant and facilities; also to meet any deficiency that may occur in any year. The Society has never had any capital stock nor has it paid out any dividends or other pecuniary benefits. It is managed by a board of fifteen directors who serve without compensation.

The Society engages in some purely charitable activities such as the free emergency treatment of all necessary deserving cases in its immediate neighborhood. Two free beds for indigent persons sponsored by another French Society are maintained, and fifteen beds are provided for aged members admitted in the discretion of the board of directors.

The Society's by-laws permit it to accept donations and since 1851 legacies, devises and gifts totalling over $360,000 have been received. However, in recent years such gifts amounted to less than one per cent of the Society's annual gross income. The Society acquired its present hospital plant largely through testamentary and other gifts and the income therefrom. Receipts from members have not been sufficient for such purpose.

On July 14, 1937, the Government, through its then Collector of Internal Revenue, officially notified the Society that it was exempt from payment of social security taxes under §§ 811(b) (8) and 907 (c) (7) of the Social Security Act, 42 U.S. C.A. §§ 1011(b) (8), 1107(c) (7), and also that it was exempt from payment of income taxes. After receipt of that notification the Society refunded to its employees all the contributions which it had theretofore deducted from their wages pursuant to the Social Security Act, and made no further deductions until April 3, 1939.

On February 24, 1939 the Society was officially notified that it had lost its income tax exemption as a corporation operated exclusively for charitable purposes, although it would be granted an exemption under another section. This communication also stated that "the status of your organization for social security tax purposes will be made the subject of a separate communication."

On April 3, 1939 the Government, by letter, revoked the exemption previously granted the Society from taxation under

the Social Security Act. The Society thereupon, under protest, paid a total of $35,269.85 to the Government representing taxes, penalties and interest for the years 1936 to 1942, inclusive.

The Society instituted suit in the District Court to recover the amount paid under protest and recovered judgment for the full amount claimed, based upon a finding that the Society was organized and operated exclusively for charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual within the meaning of §§ 811(b) (8) and 907(c) (7) of the Social Security Act.

In the case of Better Business Bureau of Washington v. United States, 66 S.Ct. 112, 114, the Supreme Court of the United States construed the statute under consideration here. In Better Business Bureau v. United States, supra, the Supreme Court was concerned with the word "*educational*" as it appears in § 811(b) (8) of the Social Security Act. We think the reasoning applies with equal force to the word "*charitable*" with which we are concerned here. The Supreme Court in Better Business Bureau v. United States, supra, had this to say, "In this instance, in order to fall within the claimed exemption, an organization must be devoted to *educational* purposes exclusively. This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." So in the instant case, in order for the Society to fall within the claimed exemption it must be devoted to *charitable* purposes exclusively *and* if we find in its operations a *single non-charitable purpose, substantial in nature,* though it may have numerous "truly" and important charitable purposes, it cannot be granted the exemption sought.

■ The by-laws of the French Mutual Benevolent Society state "the society is founded on the basis of mutuality for the treatment of sick members * * *". The underlying purpose of its organization, as we understand it, was to afford its members the best possible medical, hospital and surgical attention at the lowest possible cost. Recognizing the financial return that would be available by expanding its activities so as to make available to non-members its facilities for treatment it entered that field. This resulted in great-ly increased operations and greatly increased income and feeling that its members should benefit from this enlargement of its business it charged a greater fee for non-members than for members. This assisted in the betterment of its plant and all other facilities which afforded the opportunity for more complete and better treatment of members at lower cost, a service which *inured* to the benefit of members.

This service was of value. The proceeds that made it possible flowed from the business venture of treating non-members. Such business venture is not a charity in any sense of the word. No member of the Society in receiving the more adequate treatment at a lower cost would consider himself an object of charity but rather that he was reaping the benefit of a wise decision in electing to become a member of an organization which, through its well-managed business activities, had made the added results available to him. The receipt of 37% in 1940 and 67% in 1944 of the total income from non-members demonstrates that the activities of the Society in the non-charitable line was quite considerable and quite substantial.

■ The Society has never paid dividends to anyone but profits may inure to the benefit of a private share holder other than by monetary dividend payments. Northwestern Municipal Association, Inc., v. United States 8 Cir., 99 F.2d 460.

The case of United States v. Proprietors of Social Law Library, 1 Cir., 102 F.2d 481, is relied on by the Society, but the Government correctly points out this distinction: "There are points of similarity in the cases. But the vital one is lacking—the proprietors did not benefit at the expense of the outsiders."

The Society has cited a number of tort cases holding various types of hospitals charitable and so not liable for the negligence of doctors employed in such hospitals. Such cases are not helpful because the character of the hospitals involved was quite different from that operated by the Society. In this connection it is interesting to note that the Supreme Court of California in such a tort action held the Society's hospital liable on the ground that it was not a charitable hospital but "merely an association for mutual profit or benefit." Brown v. La Societe, etc., 138 Cal. 475, 477, 71 P. 516, 517. We conclude that the Society is not a corporation or-

246

ganized and operated exclusively for charitable purposes and therefore is not exempt from payment of social security taxes.

██ After receipt of the official notification of July 14, 1937, wherein the Society was informed that it was not liable for payment of taxes under the Social Security Act, the Society refunded to its employees all contributions which it had theretofore deducted from their wages pursuant to the requirements of the act and discontinued making such deductions until April 3, 1939, the date the Society received notice it was not exempt from social security payments.

It is the general rule that the federal Government does not lose its revenue because of the erroneous ruling of an administrative official; hence, the Commissioner of Internal Revenue was not estopped from changing his ruling that the Society was exempt. Burnet v. Porter, 283 U.S. 230, 51 S.Ct. 416, 75 L.Ed. 996; Baumgartner v. Com'r, 9 Cir., 51 F.2d 472; United States v. Tuthill Spring Co., D.C., 55 F.2d 415; National Rifle Association v. Young, 77 U.S.App.D.C. 290, 134 F.2d 524; Chiquita Mining Co. v. Com'r, 9 Cir., 148 F.2d 306. The fact that the Government should not be estopped is supported by the fact that we have no way of knowing whether or not all of the facts now known to us were presented to the Commissioner and it may well be that under the facts then before him the Commissioner ruled correctly.

The Society paid under protest not only the amount required of it but also the amount of the employees' required contribution which it had refunded and the amount which it had failed to collect after receipt of the ruling that it was exempt.

Our attention has been called to several state cases where a distinction has been made between the right of the Government to recover funds due it which had not been paid because of an erroneous ruling and money paid by an employer out of his own funds to meet the employees' share of the tax, such as was done by the Society in this case. As a matter of fact, the California District Court of Appeal made such a distinction in a case in which the Society in the instant case was a party: La Societe, etc., v. California Employment Commission, 56 Cal.App.2d 534, 133 P.2d 47, certiorari denied 320 U.S. 736, 64 S.Ct. 35, 88 L.Ed. 436.

The Government having the right to recover funds withheld because of an erroneous ruling, we fail to discern wherein this court can arbitrarily draw a distinction between the sources from which the funds are due. It was the duty of the Society to collect the employees' share. It collected money due the government and returned it to employees; in other instances it failed to collect. This return and failure was in good faith under the mistaken view that the advice of the Collector was correct. However harsh it may seem, we repeat this court is not at liberty to arbitrarily permit recovery from one source and deny it in the other. The rule of recovery if applied at all should be consistently applied. The Society collected the tax due from the employees as an agent of the Government. The money so collected belonged to the Government and was rightfully recovered by it. To require the Government to refund it would be to deplete, to that extent, a fund which is being built up to take care of not only the particular employees of the Society involved here but others; to insure security in the years when such protection is most needed.

Reversed.