## DELMO HOUSING CORPORATION v. FINNEGAN, Collector of Internal Revenue.

### No. 6113.

United States District Court
E. D. Missouri, E. D.

July 11, 1949.

Victor B. Harris and Harold C. Hanke, both of St. Louis, Mo., for plaintiff.

Drake Watson, United States Attorney, of New London, Mo., and William V. O'Donnell, Assistant United States Attorney, of St. Louis, Mo., for defendant.

HULEN, District Judge.

Defendant assessed and collected from plaintiff, for the taxable year 1946 and three-quarters of 1947, $242.40 under Federal Insurance Contributions Act, Social Security Act. Plaintiff now seeks recoupment of tax paid on ground that it is exempt under Section 1426(b) (8) of the Internal Revenue Code, 26 U.S.C.A. § 1426 (b) (8) [1] as a corporation (a) organized and operating exclusively for charitable and educational purposes, and (b) no part of its net earnings inures to any private shareholder or individual.

On January 16, 1946, plaintiff acquired from the Government by quit-claim deed several tracts of land located in Southeast Missouri upon which the Government had erected 549 small cottages, 9 utility buildings, and 2 manager's houses; and by bill of sale acquired the furniture in the cottages from the same source. The purchase price (paid by plaintiff through the Cooperative Foundation, Inc.) was $285,000.00. $73,500 was paid in cash and the balance of $211,500, secured by mortgage, is payable in 16 semi-annual instalments of $13,218.75, with interest at 3%.

Certain facts evidence the purpose of the sale. A large acreage in the counties of Southeast Missouri where the cottages were built is devoted to cotton production. This industry requires seasonal la-

---

[1] "Sec. 1426. Definitions.

"When used in this subchapter—

\* \* \* \* \* \*

"(b) Employment. The term 'employment' means \* \* \* any service of whatever nature, performed \* \* \* by an employee for the person employing him, \* \* \* within the United States \* \* \* except—

\* \* \* \* \* \*

"(8) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, \* \* \*."

bor in large numbers. The man power comes from white and colored families known as "share-croppers". Their economic condition ranks with the lowest in the United States. Many can neither read nor write their own names. In 1939 they were wholly without worldly goods and dependent on landlords for tenant shacks as a place in which to live. Their principal diet was "sow belly and corn bread". Because of bad nutrition the general state of health was "low". Some families were large—the average was "four". At "cotton-picking" time children left school and whole families went into the fields. School facilities, particularly for the colored, were inferior or non-existent. As of 1946 the per capita annual income was $379.00. In 1939 it was less. In 1939 a change was made in Government payments for cotton crop benefits. That resulted in substantial reduction in cotton acreage. Loss of housing and a reduction in work and income for the share-croppers followed. Their plight reached a crisis when they collected on the public highway in Southeast Missouri in large numbers. At this time the Government, through one of its agencies, took cognizance of their condition and constructed small cottages for their use. They were furnished and rental fixed at $3.00 per month. Many were not able to pay even this sum. Various services were furnished by the Government as a part of the project, such as food, medical care, hospitalization, and nursery schools. This arrangement continued under Government sponsorship until 1946. Then the Government decided to liquidate the project. The cottages were in ten groups in various locations. According to Government plan the liquidation was to be by group. One project of thirty houses and some farm land was sold to private parties. A number of public-spirited citizens then intervened and raised $73,500, represented by payment of $100 from each of 450 tenants then living in the remaining cottages and outright gifts of $30,750. With this sum as a down payment plaintiff acquired the remaining property. It has since been operated by plaintiff and known as the Delmo Housing project.

The agreement with the Government and plaintiff contains this restriction on the sale:

"The purchasers (plaintiff) agree to resell the individual properties on the basis of the interest rate not in excess of 3% per annum and at a price reflecting the purchase price from the Government plus a reasonable allowance for corporation expenses."

Plaintiff was incorporated by pro forma decree of the Circuit Court of the City of St. Louis December 29, 1945. The Articles of Agreement state the corporate purpose:

"To aid destitute and low income persons and families in the purchase or rental of real estate and personal property; to assist said families in connection with the operation and maintenance of said property; to manage said property and do all things in connection therewith necessary for its preservation, reconstruction or maintenance until said families are able to maintain, to operate, and to own said property independently of any help from this Corporation; to do all things which are necessary in the purchase, maintenance and management of said property; to sell, lease, rent, mortgage, give away or otherwise dispose of said property, or any other property which may be owned by this Corporation,

and in order to carry out such purposes the Corporation may buy, sell, lease, rent, mortgage real and personal property of all kinds and may execute any trust within the purview of its purposes and may receive and take by deed, bequest or devise in its corporate capacity any property, real or personal, for the uses and purposes of such trust, and execute the trust so created."

Plaintiff's by-laws on the same subject provide:

"In addition thereto the Corporation shall not, nor shall any member of the Corporation, make any profit from the activities of the Corporation. Any surplus

above reasonable reserves from the operation of the nine Delmo Labor Homes Projects in Southeast Missouri shall be expended on improvements of the property for the benefit of the residents of the projects."

The by-laws provide that members of the Corporation shall be elected by the Board of Directors; the Board of Directors shall consist of nine members, elected by the members at the Annual Meeting. In 1948 the by-laws were amended to increase the Board of Directors to fifteen persons to be elected by the members and to include three "residents of the Delmo Housing Projects".

On assuming control of the project, in January, 1946, plaintiff proceeded to make sales agreements with the share-croppers, in most cases with occupants but in any event only with the class represented by those in like circumstances. The contract sale price of each cottage and a small tract of land on which it was located was $800.00. This was approximately $280.00 in excess of the average cost to plaintiff. The market value of the cottages in 1946 was at least $1,200.00. The $100.00 previously paid by tenants was applied on the purchase price, the balance was payable at $7.50 per month plus interest, taxes and insurance. The sales contract states plaintiff is a non-profit corporation operating for the purpose of enabling the purchaser, and others similarly situated, to own homes. The terms of purchase between the plaintiff and the Government are set forth, followed by a declaration that "the ability of the Corporation to carry out its said agreement with the United States of America is dependent upon the Resident (purchaser) and others similarly situated carrying out this agreement * * *". Quitclaim deeds to all purchasers are to be delivered the second day of January, 1954. In case of default by a buyer the practice has been to credit the monthly payments as rent and refund the principal payment of $100.00. There have been two defaults as of date of trial.

In addition to financing the sale of the property plaintiff provides a community organization program. This includes medical clinics, hospitalization, recreation, playgrounds, and kindred activities. This service is financed principally by donations from churches, charitable organizations, and personal donation.

The yearly audits state that any net income is "reserved for losses and improvements to be made in community property for future years". As of this date the conclusion appears justified, that on payment of the Government loan, the only indebtedness of the plaintiff aside from current bills, there will be a substantial surplus accumulated if payments on sales contracts continue in the future as they have in the past. The rapidity with which the Government loan is being reduced demonstrates the excellent plan and good management of the undertaking of plaintiff and the progress plaintiff has made in stabilizing many families who were formerly prospective and actual recipients of public charity for housing. There is substantial ground on which to base a belief the sales contracts will be consummated. Defaults to date have been negligible.

The by-laws (Article I) control disposition of surplus funds:

"Any surplus above reasonable reserves from the operation of the nine Delmo Labor Homes Projects in Southeast Missouri shall be expended on improvements of the property for the benefit of the residents of the projects."

Paid employees of the corporation upon whose salary the tax in controversy was paid were the business manager, his secretary, and a maintenance man. Plaintiff paid the tax and now seeks recovery on grounds above stated.

Here we have a case where hundreds of people, "share-croppers", consisting largely of women and children, in the cotton section of Southeast Missouri were homeless and living in dire poverty. If they lost the use of the cottages constructed by public funds they were committed to again wander, dependent on seasonal employment for temporary housing of the lowest type. How long it would be after the Government disposed of the housing project to private parties with a profit motive

before public charity would again be called on to assist the present occupants is problematical. Plaintiff's financing the sale of the houses, it can fairly be assumed, has saved public funds not alone for housing "share croppers" but in other ways. Construction of public housing for those committed by their status in life to live in slums in the city frees the "areas" from "disease, crime and juvenile delinquency" and is therefore "charity of the most practical character," the Supreme Court of Missouri has declared they "are firmly convinced". See Bader Realty & Investment Co. v. St. Louis Housing Authority, Mo.Sup., 217 S.W.2d 489, 492. A like activity serving a similar class and purpose in a rural area is also a "charity of the most practical character". Crime, disease, and juvenile delinquency breed in poverty wherever it is found.

The sole motive of those who organized and have controlled the operation of plaintiff was exclusively charitable as that term is defined in modern case law:

"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons * * * by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." St. Louis Union Trust Co. et al. v. Burnet, Commissioner, 8th Cir., 59 F.2d 922, loc. cit. 926.

The terms of sale by the Government lends weight to this finding. If the service in which plaintiff is engaged is not exclusively charitable and for the promotion of the public welfare, how else can the Government justify the price at which it sold the property and the restrictions on its sale by plaintiff as to "price" and "interest" rate.

Plaintiff's operation of the housing project promised these people, in large numbers, a modest home, simply furnished, at a price within their means. It will be theirs, partly, by virtue of their own efforts. Their toil, their thrift and their sacrifice will make ownership possible. There is substantial evidence that, given a chance to work out their housing problems on the basis provided by plaintiff, over 500 families will eventually own their own homes. Delivery of title is proposed; meantime plaintiff is endeavoring to instruct the prospective owners in the responsibilities that go with ownership.

We cannot agree with the Government that the charitable nature of the enterprise ceased when plaintiff assumed the public burden and undertook to make home owners of those living in the houses. The ambition for home ownership kindled by plaintiff is a foundation for good citizenship. It awakened hope for a more stable and happier life. The aid, financial and managerial, furnished through plaintiff is the substance on which these people are being transformed from objects of public charity to self-sustaining citizens. Plaintiff's practical plan and its commendable prospective result should not destroy its charitable nature permanently. Bader Realty & Inv. Co. v. St. Louis Housing Authority, supra, 217 S.W.2d loc. cit. 492. It is not necessary to give a broad construction, Bohemian Gymnastic Ass'n v. Higgins, Collector, 2 Cir., 147 P.2d 774, to the statute or resolve doubts against the Government, St. Louis Union Trust Co. v. Burnet, supra, or apply a liberal construction, United States v. Proprietors of Social Law Library, 1 Cir., 102 F.2d 481, to reach the conclusion the record presents an operation by plaintiff exclusively charitable. A fair and reasonable construction of the statute convinces this Court that plaintiff's organization and present operation is exclusively charitable. Religious and charitable organizations have recognized plaintiff as a suitable agency for the spending of their charitable donations, to promote social service work among the occupants of the housing project.

The evidence fails to establish the income of plaintiff inures to the benefit of any individual. Aside from original donations, small sums resulting from occasional rummage sales and some income from rents, all money received by plaintiff comes from the house purchasers. Plaintiff's con-

tract with the Government requires the houses be sold by plaintiff at cost. It can charge only such amount in addition as will defray its cost of operation. Under the Government contract, charter and by-laws of plaintiff and the sales agreements, there can be neither a net income nor a surplus in fact to plaintiff. A surplus simply means plaintiff has overestimated cost of its operations. Any surplus in plaintiff's hands would represent a refund due the housing project when it comes to an end, expendable only for the use and benefit of the project.

Dedication and use of the income of plaintiff exclusively for the benefit of the class described, through the housing project, qualifies plaintiff for the tax exemption sought in this proceeding. See Bohemian Gymnastic Ass'n v. Higgins, supra; Roche's Beach v. Commissioner, 2 Cir., 96 F.2d 776; Trinidad v. Sagrada Orden etc., 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458; Salvation Army v. Hoehn, 354 Mo. 107, 188 S.W.2d 826. Defendant cites only the case of United States v. La Societe Francaise De Bienfaisance Mutuelle, 9 Cir., 152 F.2d 243. A reading of that case will show a clear distinction as to the facts from those in the case for ruling. Plainly the members of "La Societe" were not potential subjects for public charity, but were self-sustaining members of society who organized a hospital group to reduce medical expenses. Facilities of the organization were available to the public at large. Profits on income from the public inured to members of "La Societe".

## Findings of Fact

1. Plaintiff is incorporated under pro forma decree in the State of Missouri and its corporate purposes are to aid destitute persons in the purchase of small homes and assist them in the operation and maintenance of the property.

2. Under the by-laws of the plaintiff no member can make any profit from the activities of the corporation and all surplus over and above expenses is committed to the improvement of the property of the housing project, solely for the benefit of the occupants of the housing project.

3. Under the contract of purchase from the United States, the charter and by-laws of plaintiff and contracts of sale between plaintiff and occupants of the houses, the property is to be sold at cost by plaintiff and any surplus from plaintiff's operations must be used for the improvement, use and benefit of the property and its purchasers.

4. The charitable purposes of the plaintiff consist of providing funds and financing the purchase of property exclusively by and for a class, namely the poor and destitute whose occupation is share-cropping, and to carry on charitable enterprises for their benefit through social workers in such subjects as health, hygiene, recreation, and education.

5. All activities of plaintiff were solely and exclusively for the purpose of raising sufficient funds to carry on its charitable purposes.

6. Income received by plaintiff from all sources is devoted to its charitable purposes for a poverty stricken class, referred to as "share-croppers".

7. No part of the net income of plaintiff inures to the benefit of private shareholders or individuals.

8. Plaintiff was organized and operates exclusively for charitable purposes.

## Conclusions of Law

Plaintiff, being organized and operated exclusively for charitable purposes, and no part of its earnings inuring to the benefit of any private shareholder or individual, is under Section 1426(b) (8) of the Federal Insurance Contributions Act exempt from the tax therein provided for.[2]

Let judgment be settled and submitted accordingly.

---

[2] Either party may submit requests for additional findings of fact and conclusions of law.