ALFREDO NAZARIO TIRADO, SECRETARY OF LABOR OF PUERTO RICO, Defendant and Appellant, *v.* ASOCIACIÓN DE SEÑORAS DAMAS DEL SANTO ASILO DE PONCE, Plaintiff and Appellee.

No. R-65-173. Decided February 24, 1967.

132

*Guillermo Estrella Frasqueri* and *Lydia A. Torres González* for appellant. *José Guillermo Vivas* and *Jorge Lucas P. Valdivieso, Jr.,* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question raised in this case is whether appellee herein, Asociación de Señoras Damas del Santo Asilo de Ponce, is entitled to reimbursement of the amounts paid by it by virtue of the Employment Security Act of Puerto Rico. This requires us to determine whether said association is exempt from the payment of the contributions imposed by said Act.

We conclude that because appellee operates a hospital principally for the benefit of well-to-do patients and patients hospitalized on the basis of contracts negotiated with several government hospitals and one private institution, appellee is not operated exclusively for charitable purposes and therefore not exempt from payment of the contributions in question.

In its complaint in this case appellee claims the reimbursement of $53,934.72 mistakenly paid by it to appellant for said contributions during the years from 1957 to 1962, both inclusive. It alleges that it is exempt, but appellant has refused to acknowledge this exemption denying the reimbursement requested.

The provisions of the Employment Security Act and the Articles of Incorporation of appellee which play a part in the consideration of this question are the following:

"This chapter shall be known and may be cited as the Puerto Rico Employment Security Act. This chapter *shall be liberally construed to accomplish its purposes to promote employment security* by affording opportunities for placement through the maintenance of a system of public employment offices, and to provide, through the accumulation of reserves, for the payment of compensation to individuals with respect to their unemployment.

"The Legislature hereby declares its intent to provide for the carrying out of the purposes of this chapter in cooperation with the appropriate agencies of other States and of the Federal Government."[1] (Italics ours.) (29 L.P.R.A. § 701.)

The term employment shall not include:

" . . . . . . . .

"(S) Service performed as employee of a *corporation*, institution, society, association, foundation or any community chest or any other organization described in section 501(c)(3) of

---

[1] The Declaration of Policy of this Act reads:

"Economic instability arising from unemployment is a serious threat to the health, security and welfare of the people of Puerto Rico. Unemployment is therefore a matter of general interest and concern which calls for adoption by the Legislature of adequate measures for checking its growth and for lightening the burden it brings about and which inexorably falls upon the unemployed worker and his family. The attainment of social security requires protection against this grave danger to our economic well-being. This objective can be achieved through the maintenance of free public employment offices, through the adoption of suitable methods for confining unemployment to a minimum, and through the systematic accumulation of funds during periods of employment that will make possible the paying of benefits during periods of unemployment, thus holding up the purchasing power of the workers; promoting the mobility and utilization of the best skills of the unemployed, and counteracting the serious social consequences of unemployment. Therefore, the Legislature finds and declares that the citizens of Puerto Rico require the enactment of this measure, within the police power of the Commonwealth of Puerto Rico, for the establishment and maintenance of free public employment offices and for the compulsory provision of reserve funds to be used for the benefit of the unemployed."

the United States Internal Revenue Code *created and administered exclusively for* religious, *charitable,* scientific, literary or educational *purposes,* or for the prevention of cruelty to children or to animals, *no part of the net earning of which inures to the benefit of a shareholder or a private person,* provided said organization is exempt from income tax under section 501 (a) of the Internal Revenue Code. This exemption shall not be extensive to service performed in connection with the construction, demolition, enlargement, remodeling or substantial repair of buildings and other similar works." (Italics ours.) (29 L.P.R.A. § 702 (k) (6) (S).)

Appellee's Certificate of Incorporation, as amended in 1951, provides that: (1) Art. 5.—"The purposes of the Association shall be the hospital care of poor patients free of charge and also of well-to-do patients who contribute the quotas designated by the Board of Directors, for the maintenance of the hospital established in Ponce, P.R. under the name of 'Santo Asilo de Damas', as well as the maintenance of an asylum or home for orphan children, a nurse school and any other worthy cause which the Association deems convenient to establish"; (2) Art. 7.—"The Corporation shall be governed by the general Board of members and a Board of Trustees or Directors composed of fourteen persons, nine ladies and five gentlemen elected at the first meeting which will be held . . ."; (3) Art. 9.—"To become a member of this institution with the approval of ¾ of the members who compose the Board of Directors, the person must be a resident of Ponce"; and (4) Art. 10.—"The resources of the Association shall consist of (a) the rentals of its property acquired by inter vivos and mortis causa gifts, (b) donations made to the institution, (c) quotas paid by well-to-do patients who receive care either in the hospital or asylum of the Association and of (d) any other resource or income permitted by law."

In its lengthy and well-reasoned opinion, the trial court decided that appellee is exempt from the payment of contri-

butions for employment security; that it paid unduly and, therefore, it should be reimbursed the contributions paid for 1959, 1960, 1961 and 1962, amounting to $39,445.04, with 6% annual interest; that the reimbursement for contributions paid for years 1957 and 1958 amounting to $6,545.24 and $7,944.44, respectively, has prescribed, as stipulated by the parties, and therefore does not lie.

In synthesis, said court based its opinion on the fact that appellee is a nonstock corporation organized for nonpecuniary purposes; that its only members are the persons which constitute its board of directors none of which, as well as no other particular individual, receives any benefit from it; that the income it gets from its properties consisting of rural and urban farms, close to a million dollars in bank stocks, and of its hospital, was devoted to charity work such as medical care for the poor, maintenance of an orphan asylum, a nurse school and to the scientific aim of training interns and resident physicians. In support of its conclusion the court said that the legislative intention was that the exemption in question be construed liberally and cited the cases of *Trinidad, Insular Collector* v. *Sagrada Orden de Predicadores*, 263 U.S. 578 (1923), and others.

### Allegations Made by Appellant

Appellant alleges that appellee is not carrying out its purposes inasmuch as it is engaged in commercial activities consisting in holding stock in banks, receiving income from the lease of farms and in executing contracts with private and government enterprises to provide hospital services to members or beneficiaries of the latter; that its situation is similar to that of *Buscaglia, Treas.* v. *Tax Court*, 66 P.R.R. 623 (1946); and that the contribution in this case was paid voluntarily and its reimbursement should not include interest (29 L.P.R.A. § 709(d)). In support of these allegations he cites several cases, among them, *Hassett* v. *Associated Hospi-*

*tal Service Corporation,* 125 F.2d 611 (1st Cir. 1942) ; *Smith* v. *Reynolds,* 43 F.Supp. 510 (D.C. Minn. 1942) ; *Consumers Research* v. *Evans,* 24 A.2d 390 (N.J. 1942).

## Facts of the Case

For a better understanding of the facts of the case it is necessary to indicate that: (a) the property of appellee consists of (1) 1,790 shares in the Banco de Ponce and 970 shares of the Banco Crédito y Ahorro Ponceño, jointly valued at $958,050; (2) three rural farms with a total area of 581.75 cuerdas which produce income amounting to $15,000; and (3) urban property which yield an income of $4,500 to $5,500 a year. Appellee has sold property worth $308,389.64 and has bought others since it received legacies of property; (b) according to data supplied by appellee itself, during the years in question its hospital took care of patients referred by private enterprises, hospital associations or government agencies, such as The Blue Cross, Central Mercedita, Veterans Administration, State Insurance Fund, S.S.S., Federal Health, and Vocational Rehabilitation Service, with which appellee negotiated contracts pursuant to which appellee agreed to provide hospital services for pay to members or patients of such institutions or agencies; those patients were considered as "part charity", that is, *"caridad parcial"*, because the income received under such contracts did not cover the cost of the services the appellee rendered to those patients; (c) in addition to the patients mentioned appellee also took care of patients classified as "private", that is, patients who paid for the services according to appellee's regular rates; and (d) "charity" patients, meaning patients who were taken care of and who were not charged for the services rendered.

During the years in controversy, that is, 1959, 1960, 1961 and 1962 the proportion of the latter patients as compared to the total number of patients was the following:

| | 1959–%– | 1960–%– | 1961–%– | 1962–%– |
|---|---|---|---|---|
| "Private" | 44.41 | 50.28 | 46.10 | 50.97 |
| "Part Charity" | 49.42 | 44.26 | 48.58 | 43.42 |
| "Charity" | 6.17 | 5.46 | 5.32 | 5.61 |

The evidence shows that (1) appellee has sustained losses in the services rendered to patients referred by hospital institutions who contracted its services—the so-called "part charity" patients; and (2) during the periods in controversy appellee had the following net income, after having deducted the payments for the contribution for employment security.

| 1959 | $ 9,972.28 |
|---|---|
| 1960 | 28,298.37 |
| 1961 | 73,172.03 |
| 1962 | 18,070.20 |

We should point out besides, that appellee enjoys exemption from property and excise taxes because it is considered a nonprofit organization. By virtue of Act No. 41 of May 29, 1964 (13 L.P.R.A. § 199), it was specifically exempted from payment of all types of taxes and revenues on the condition that it would establish and maintain at its hospital a department or ward to render dispensary and hospitalization services to the indigent.

## Law Applicable

■ Section 2 (k) (6) (S) of the Employment Security Act, *supra*, establishes, among others, the following requirements of eligibility for an association to be tax exempt:

(1) that it be created exclusively for one of the exempt purposes.

(2) that it be operated exclusively for one of the exempt purposes.

(3) that none of its net earnings inures to the benefit of a stockholder or private person.

In the absence of one of the preceding requirements there is no right to the exemption. *Department of Mo., V.F.W.* v. *Division of Emp. Sec.,* 317 S.W.2d 837 (Ct. App. Kan. 1958); *United States* v. *Community Services,* 189 F.2d 421 (4th Cir. 1951); *Employment Commission* v. *Betthesda Foundation,* 128 P.2d 874 (Ct. App. Cal. 1942).

Appellee claimed the exemption in question on the basis that it was created and administered exclusively for charitable purposes.

Pursuant to the report of the House Treasury Committee, the scope of Joint Resolution No. 125 of 1957, amending the exempting provision of the Employment Security Act, is to exempt the service rendered by the employees of a nonprofit corporation. Said report cannot be construed as that the Act exempts these corporations from payment of the employer contribution which it provides, solely because they were not organized for purposes of profit. The Act clearly establishes other additional conditions with which the employer is bound to comply in order to qualify for such exemption. Said report has no other scope than that of singling out the entities in favor of which the exemption was provided.

■ Which is the rule we should follow in the interpretation of the statutory provision in question? The Act itself provides that "it shall be liberally construed to accomplish its purposes to promote employment security . . . and to provide, through the accumulation of reserves, for the payment of compensation to individuals with respect to their unemployment." In *In Re Oakwood Cemetery Assn.,* 245 N.Y.S.2d 262 (1963), it was said that "social legislation [Unemployment Security Act] of the type here involved should be construed to provide protection to as many employees as possible and thus that exemption should be found only where the legislative standards for exemption are clearly met." *Pickman* v. *Weltner,* 382 P.2d 298 (Kan. 1963); *Brown* v. *La Nasa,* 145 So.2d 132 (La. App. 1962). The

140

exemption under this kind of legislation must be strictly construed and it must be shown that the hospital which claimed the exemption is operated with a charitable purpose only. *La Societe Française, Etc.* v. *California Employ. Co.,* 133 P.2d 47 (Ct. App. Cal. 1943).

█ Nevertheless, it has been decided that the term "exclusively" used in the provision in question means "primarily", "principally", "in large part." *National Capital Girl Scout Coun.* v. *District Unemp. Comp. Bd.,* 231 F.Supp. 546 (D.Ct. D.C. 1964).

The difficulty which has arisen in construing this type of exemption consists in that similar exemptions regarding the payment of income tax have been interpreted liberally to the extreme that a rule has been established, based on the case of *Sagrada Orden, supra,* to the effect that the controlling element is not the source of income of the association—the latter may have net profits, receive a benefit or charge for its services and even own and administer a commercial activity—but the use given to its income and that the latter does not inure to the benefit of any particular person.[2] But in *United States* v. *Community Services,* 189 F.2d 421, 427 (4th Cir. 1951), it was said that the rule established in *Sagrada Orden, supra,* has been undermined by subsequent decisions.

█ In *In Re Gem State Academy Bakery,* 224 P.2d 529 (Idaho 1950), on the other hand, it was decided that in the interpretation of the exemption from the payment of contribution under unemployment compensation laws it is not

[2] See the cases of *C. F. Mueller Co.* v. *Commissioner of Internal Revenue,* 190 F.2d 120 (3d Cir. 1951); *Squire* v. *Students Book Corp.,* 191 F.2d 1018 (9th Cir. 1951); *Willingham* v. *Home Oil Mill,* 181 F.2d 9 (5th Cir. 1950); *Commissioner of Internal Revenue* v. *Orton,* 173 F.2d 483 (6th Cir. 1949); *Commissioner of Internal Revenue* v. *Battle Creek,* 126 F.2d 405 (5th Cir. 1942); *Koon Kreek Klub* v. *Thomas,* 108 F.2d 616 (5th Cir. 1939); *Roche's Beach, Inc.* v. *Commissioner of Internal Revenue,* 96 F.2d 776 (2d Cir. 1938).

proper to apply the liberal interpretation rule of income tax exemptions. It was said therein that "The middle course, which has received judicial sanction, is that, with due regard to the strict construction of the exemption against one claiming it, yet recognizing the beneficence of such eleemosynary institutions, and at the same time the purposes of the Unemployment Compensation Law and the necessity for liberally construing the same, each activity is to be judged by itself. *Thus those activities carried on clearly within the religious, scientific, literary and educational fields are to be exempt; and those activities, though carried on by such organizations, if of a commercial nature, require that the employees in such activities be given the protection of the Unemployment Compensation Law.*"[3] The court decided that under the unemployment compensation act the tax exemption of a religious organization did not lie regarding the truck drivers of a bakery operated as part of the vocational system of a school operated by the organization and where 150 students received

---

[3] In Puerto Rico we have only had occasion of interpreting the scope of the property tax exemption provided by § 291 of the Political Code (13 L.P.R.A. § 551(e)). We have decided that the exemption should be strictly construed but not "as necessarily excluding the benefits of exemption, but rather that it is not to be extended beyond ascertainable legislative intent"; that "since the exemption is in rem, the manner in which the plaintiff entity is set up is not controlling . . . but the important thing is to determine the predominant use to which the association has devoted its property"; that "Another controlling element is the method of doing business, not the method of distributing the corporation's capital stock." We denied the exemption in *Catholic Univ. of P.R.* v. *Sec. of the Treas.*, 93 P.R.R. 509 (1966); in *School of Commerce* v. *Tax Court*, 77 P.R.R. 830 (1955) and in *Chamber of Commerce* v. *Tax Court*, 67 P.R.R. 400 (1947), because in these cases the property was used for commercial purposes. We sustained the exemption in *Club Yaucano* v. *Sec. of the Treas.*, 83 P.R.R. 601, 607–608, 609, 611 (1961), because the property was utilized by a nonprofit organization, for purposes of leisure and recreation of its associates. In *Buscaglia, Treas.* v. *Tax Court*, 66 P.R.R. 623 (1946), we denied the exemption to a hospital association because "been cooperatively operated primarily for the mutual benefit or advantage of the dues-paying members themselves rather than for the comparatively few . . . who are treated free of charge."

religious, intellectual and vocational education. The bakery employed students as part of their vocational training. The production was partly consumed at school and in a coffee shop belonging to the organization and it was partly retailed to several routes for which the trucks driven by the drivers in question were used. The court said it did not apply the liberal interpretation rule established regarding the exemptions to the income tax act because the intent and purpose of the government in adopting the unemployment compensation statute is not to raise money for revenue purposes but to raise money to do away with unemployment; that this act shall be construed liberally so that its humanitarian purposes can be accomplished. See *Byrd* v. *Employment Security Agency*, 388 P.2d 100 (Idaho 1964); *Smith* v. *Reynolds*, 43 F.Supp. 510 (D.C. Minn. 1942).

In *Better Business Bureau* v. *U.S.*, 326 U.S. 279, 284 (1945), the court held that the employer's activities "are largely animated by this commercial purpose" and therefore it concluded that when an association created for nonprofit purposes engages in just one activity of a nature substantially different from those enumerated in the tax exemption provided by the Social Security Act, the employer loses the exemption no matter the number or importance of the purposes enumerated in the exemption he prepares. In *Institute for Trend Research* v. *Brown*, 124 A.2d 195, 198 (N.H. 1956), the tax exemption was denied under the unemployment compensation act because, "The total activities [of the employer] . . . were directed fundamentally to private research for scientific industries rather than to basic trend research available generally to the public."

### *Argument and Decision*

The problem in this case narrows down, therefore, to analyzing the creation of appellee, its administration and

activities and determining whether it was created and administered for the exempt purposes exclusively.

There is no doubt that appellee was created for charitable purposes. Although its by-laws provide that it shall have members, in fact it only has those who make up its board of directors and none of them profits in any way, or receives any share from the income of appellee. It is likewise evident that the orphanage as well as the nurse school and the training of physicians are educational and charitable activities. Therefore, there is no doubt that regarding these activities appellee is exempt from the payment of the contribution under the Employment Security Act, as long as they are administered separate and independently of the hospital activity.

We have yet to consider the hospital activity of appellee. It does not carry out said activity for the purpose of rendering hospital services to its members as in *Buscaglia, Treas.* v. *Tax Court, supra.*[4] The fact that it receives income from that operation does not, in itself, affect the charitable nature of the activity. It was so decided in *Intercity Hospital Ass'n* v. *Squire,* 56 F.Supp. 472 (D.C. Washington, S.D. 1944). In *Intercity Hospital Ass'n, supra,* however, the court took into consideration, in upholding the exemption, two circumstances which were not established in the case at bar, namely (1) that the facilities of the employer constituted more than fifty percent of the hospital facilities in a region inhabited by around 50,000 persons engaged in woodcutting in the forests and other related activities; and (2) that the evidence showed that the hospital facilities of employer in benefit of those persons could only be continued if it were relieved from the tax burden. There is no doubt that the court concluded,

---

[4] And in the cases of *United States* v. *La Societe Française De Bien, Mut.,* 152 F.2d 243 (9th Cir. 1945); *Hassett* v. *Associated Hospital Service Corporation, supra;* and *La Societe Française, Etc.* v. *California Employ. Co., supra.*

under these particular circumstances, that the benefit of the social security contribution was outweighed by the benefit to the general welfare contributed by the hospital services rendered by the employer. This rule was subsequently applied in *C. F. Mueller, supra,* in order to sustain the exemption of the Income Tax Act of a corporation organized to benefit the school of law of New York University, in spite of the fact that the institution continued operating a food products manufacturing business which it acquired upon merging with the private corporation which owned and administered it.

The facts in the case before us show that appellee's hospital only rendered a very limited amount of charitable services. Actually appellee operated it as a commercial activity, because in order to procure patients, in addition to the large number of well-to-do patients it attracted, it sought contracts with several hospital organizations for the purpose of rendering its medical services to their members, as was the case with the Blue Cross and the S.S.S., or to employees of a private enterprise as in the case of the sugar firm Central Mercedita, or to persons entitled to receive them through government concerns like the Veterans Administration, the State Insurance Fund, Vocational Rehabilitation and the Federal Public Health Service. In the latter's case the contract in question was obtained through public bids. It is common knowledge that the contracts in question are solicited and sought by many private hospitals, from which we can infer that appellee obtained them in open competition with the other hospitals because it offered adequate services at the lowest prices.

The fact that in practice appellee suffered losses in those contracts does not mean that it was rendering a charitable service, for the amount of the losses, to the patients treated pursuant to such contracts, but rather that appellee erred

in estimating its bid for them or that it administered its hospital at higher expenses than expected.

There are not in this case circumstances such as in *Intercity Hospital Ass'n, supra*, to induce us to sustain the exemption claimed. On the contrary, it is known that in the Ponce area there are in operation several hospital facilities and the evidence shows that paying the contributions in question is not going to prevent appellee from rendering to the community the excellent and dedicated service it has been offering during so many years. On the contrary, it will render it possible for its employees to enjoy the benefits of the Employment Security Act, thus accomplishing the legislative purpose stated therein.[5]

Appellee points out that Act No. 41 of March 29, 1964, exempted from every kind of contributions and taxes not only appellee but also its lands, buildings, garages, annexes, physicians' and nurses' residences, existing or to be built in the future, including all the chattels used in its hospital. It argues that this legislative decision, together with the fact that it had previously been declared exempt from the property and excise taxes is an acknowledgment, on the part of the Government of Puerto Rico, that "appellee is a nonprofit organization whose net income does not inure to the benefit of any particular person as well as of the primarily charitable use appellee has been giving to the property used by its hospital."

It is true that any doubt which could have existed was definitively cleared by said Act No. 41. Yet the fact that the foregoing tax exemptions of appellee were included and actually reaffirmed by said Act No. 41 cannot have the scope sought by appellee of establishing it as an interpreta-

---

[5] Pursuant to the provisions of said Act where the employer is exempt from the payment of the contribution provided by it, its employees are deprived of the benefits of said Act. (29 L.P.R.A. §§ 702(n) and (o), 703(c), and 707(f).)

tive basis to conclude that it qualified for exemption for the years in controversy under the Employment Security Act. As Act No. 41 expressly provides that it has prospective effect, it is inappropriate to pass on its scope at this time and more specifically if it covers the employer's contribution under the Employment Security Act.

The truth is that the evidence has shown, for the purposes of the exemption under this act, that during the years the claim in this case refers to (1959–1962), on account of the contracts for hospital services appellee executed with several enterprises and the scant services rendered to indigent patients, appellee was not administered, as far as its hospital is concerned, primarily for charitable purposes.

 The contribution which under the act in question every employer should pay is of a special and different nature from the taxes ordinarily levied and collected and which are deposited in the government's general fund to take care of the services it renders to the community in the following aspects: (29 L.P.R.A. § 702(g) and (m); §§ 703 and 704) (1) The Employment Security Act itself defines this contribution as "the money payments . . . to be made into the fund by an employer on account of having individuals performing services for him"; (2) said fund is the unemployment fund supported by the contributions of employers, at a rate of certain percentage of their payrolls, from which unemployment benefits are paid to insured workers.

There remains to consider the contention based on a letter signed by the director of the Office of International Operations of the Federal Internal Revenue Service, of May 27, 1965, which is called a "determination letter" which informs that in the opinion of said director, "based upon the evidence presented, that you are exempt from United States income tax under section 501(c)(3) of the Internal Revenue Code of 1954, as it is shown that you are organized and operated exclusively for educational, charitable and scientific pur-

poses." That letter adds that appellee is not liable for the tax imposed under the Federal Unemployment Tax Act. Appellee attached said letter to its brief before us not for the purpose of having it admitted in evidence but it maintains that "the federal exemption having been discussed in appellant's brief, it is fair that that Honorable Court consider the letter of official determination of the Department of the Treasury of the United States to rebut the contentions in appellant's brief." In his brief appellant made reference to a letter of June 29, 1964, signed by the head of the Section of Exempt Organizations of the Internal Revenue Service, addressed to the National Catholic Welfare Conference, informing him that the institutions appearing in the Official Catholic Directory of 1945 (where appellee is listed) are entitled to exemption under the provisions of § 501(c)(3) of the 1954 Code and are not liable for the tax imposed by the Federal Unemployment Tax Act. Appellant commented that in spite of the fact that the trial judge denied the admission of that letter in evidence because it is an interpretation which "the court can make by examining the federal and the Puerto Rican acts", appellee attached it to its motion opposing the petition for review in this case. It is, then, a document brought to our attention regarding evidence offered and not admitted by the trial court, which ruling was not timely objected by appellee.

In view of the preceding situation, it is not necessary to give any consideration to the "determination letter" in question. At any rate, the record of the case does not show the evidence on which it was based. Nor do we have before us proof on whether the circumstances regarding the administration of appellee's hospital which gave rise to that determination were the same which prevailed during the years in controversy, as they appear from the evidence in this case.

From the financial reports of appellee and from other evidence in the record it appears that (1) the expenses of

the orphanage administered by appellee through a division thereof called Institución Ferrán are accounted for separately and independently of the other activities of appellee; (2) the salaries of the personnel of said Institución are included in those expenses; (3) no contribution under the Employment Security Act regarding the payrolls of said activity has been accounted for as paid; (4) the orphanage is operated in physical facilities separate and independent of the other activities of appellee; and (5) the income and expenses of the other activities of appellee appear accounted for jointly and include payment of the contribution in question which reimbursement is claimed in this case, undoubtedly because both the nurse school and the training of physicians are activities which, because of their nature, are conducted in an integrated form with that of the hospital.

From the foregoing it is apparent that the school and charitable activities of Institución Ferrán were carried out separately and independently of the others and, therefore, appellee must be considered exempt from payment of the contribution under the Employment Security Act regarding the payrolls of said Institución during the period covered by the claim in this case.

On the other hand, as the activities of the nurse school and of the training of physicians were conducted in an integrated manner together with the hospital activity and appellee was not eligible for the exemption of payment of the contribution in question, regarding this activity, neither could it be eligible regarding those other two.

The record shows that appellee paid the contributions the reimbursement of which it claims on the basis of the payrolls of these last activities.

For the reasons stated, we find it unnecessary to consider the rest of appellant's assignments. By virtue thereof, the judgment entered by the Superior Court, Ponce Part, will

be reversed, and another rendered instead dismissing the complaint in this case.

