SOUND HEALTH ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8144-77X.    Filed November 13, 1978.

*William N. Mathias III*, for the petitioner.
*James J. McGovern*, for the respondent.

OPINION

STERRETT, *Judge:* This is an action for declaratory relief brought by petitioner Sound Health Association against respondent Commissioner of Internal Revenue Service under the terms of new section 7428, I.R.C. 1954. Respondent has determined that petitioner qualifies as an organization described in section 501(c)(4), but fails to qualify as an organization described in section 501(c)(3). The only issue before the Court is whether or not petitioner qualifies as an organization described in section 501(c)(3).

The administrative record herein (sometimes referred to as the record), which includes all the facts upon which respondent made his final adverse determination, was submitted to this Court under Rule 217(b)(1), Tax Court Rules of Practice and Procedure.[1] The case was submitted to the Court under Rule 122 by joint motion of the parties. The facts and representations contained in the record are assumed to be true for purposes of this proceeding. The administrative record is incorporated herein by this reference. We will summarize the facts we deem relevant to our analysis of the issue at hand.

The petitioner (sometimes hereinafter referred to as the Association) is a nonstock, nonprofit corporation organized under the provisions of the Washington State Non-Profit Corporation Act. Wash. Rev. Code ch. 24.03. As a nonprofit corporation, the petitioner cannot, by Washington law, be operated for the personal benefit of any member, officer, or director. Its principal place of business is in Tacoma, Wash., and its articles of incorporation were filed of record on June 26, 1972. Extensive amendments to the articles were adopted on February 20, 1973. Those parts of the articles and their amendments which are material to this action are set forth below. The amendments are set off in italics:

---

[1]Hereinafter all references to Rules are to Tax Court Rules of Practice and Procedure.

## ARTICLE THREE

Section 1. Purposes

a. To establish and maintain services and facilities for the care of persons suffering from illnesses or disabilities which require that the patients receive in- or out-patient health care.

b. To carry on any educational activities related to rendering care to the sick and injured or the promotion of health, which in the opinion of the board of directors, may be justified by the facilities, personnel, funds or other requirements that are, or can be made, available.

c. To promote and carry on scientific research related to the care of the sick and injured insofar as, in the opinion of the board of directors, such research can be carried on in, or in connection with its services and facilities.

d. To participate, so far as circumstances may warrant, in any activity designed and carried on to promote the general health of the community.

e. *To promote the general health of the community by making available its services, resources and facilities to those persons who may not be able to pay for services rendered and not exclusively to those who are members of Sound Health Association and/or otherwise able and expected to pay, to the extent of the financial ability of the corporation to do so.*

Section 2.

This corporation is organized exclusively for charitable, scientific and educational purposes as a nonprofit corporation, and its activities shall be conducted for the aforesaid purposes in such a manner that no part of its net earnings will inure to the benefit of any member, director, officer or individual. It shall not be its purpose to engage in carrying on propaganda or otherwise attempting to influence legislation. *The corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of these articles, this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the purposes of this corporation.*

*Section 3.*

*Upon the dissolution of this corporation the board of directors shall, after paying or making provision for the payment of all the liabilities of the corporation, dispose of all the assets of the corporation exclusively for the purposes of the corporation in such manner, or to such organization or organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue law), as the board of directors shall determine. Any of such assets not so disposed of shall be disposed of by the Superior Court of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized and operated exclusively for such purposes.*

## ARTICLE FOUR

Section 1. General Powers of this Corporation

\*       \*       \*       \*       \*       \*       \*

f. To lend money to its employees *other than its officers and directors.*

\*       \*       \*       \*       \*       \*       \*

m. [This subsection was deleted.] To establish and maintain reserve, equity, surplus or other funds, and to provide for the time, form and manner of distribution of such funds among members, shareholders or other persons with interests therein in accordance with the articles of incorporation.

## ARTICLE FIVE

Section 1. Members

Public and private organizations and individuals interested in the objectives and purposes of SOUND HEALTH ASSOCIATION shall be eligible for membership *as voting members and/or as* non-voting associate members as provided in the By-Laws.

*No person shall be denied membership because of race, creed, sex, national origin or political conviction.*

*Section 2. Directors*

*a. The affairs of this corporation shall be managed by a board of directors of not fewer than three (3) nor more than twenty-six (26) directors. Directors shall be selected in the manner and for the terms provided in the By-Laws.*

*b. The members who appointed or elected a director may remove him at any regular meeting of such members or at any special meeting of such members called for that purpose, if notice has been given as hereinafter provided. A member who desires to propose the removal of a director shall notify the Secretary of the Association at least twenty (20) days before the meeting. The notice shall identify the director whose removal will be considered and briefly state the grounds for removal. The Secretary shall distribute the notice to all members entitled to vote on the removal. Absence from three (3) consecutive regular board meetings shall automatically create a vacancy unless excused by the board.*

\*       \*       \*       \*       \*       \*       \*

## ARTICLE SEVEN

[This Article, which lists the Association's board of directors, was amended by striking the last paragraph thereof which had said:]

The said directors are the only voting members of this corporation. Committee chairmen of the corporation's working committees may become voting members of the corporation by a two-thirds (2/3) majority vote of the voting members of the corporation.

\*       \*       \*       \*       \*       \*       \*

## ARTICLE NINE

[This Article was deleted in its entirety.]

On dissolution of this corporation, the assets of this corporation may only be distributed to corporations or associations engaged in identical purposes and objectives as this corporation, and such distributees must have and enjoy identical state and federal tax exempt status as this corporation has and enjoys at the time of such distribution.

The Association's bylaws provided, as of January 18, 1973, in relevant part as follows:

### PREAMBLE

(a) The purpose of Sound Health Association is to promote the maintenance of optimal personal health by making available to the residents of the community comprehensive personal health care services and resources aimed at preventing and curing specific diseases, reducing debilitation and discomfort, and improving individual health behavior, in a manner which is responsive to the needs and desires of the persons being served, and which reduces the impact of cost as a barrier to securing needed resources and services.

(b) The services and resources will be made available without regard to race, creed, sex or national origin and the Association shall further extend its services to the economically disadvantaged and medically underserved population of Pierce County to the maximum extent practicable.

(c) This Association shall place special emphasis on preventive medicine and health education programs conducted as a community service for the benefit of non-members as well as members.

(d) This Association shall also place special emphasis on the acquisition or construction of comprehensive health care facilities which shall be available to the economically disadvantaged and medically underserved as well as members of the Association.

### ARTICLE I

#### MEMBERSHIP

*Section 1. Classifications of Membership*

There shall be three (3) classifications of membership: (1) individual family membership, (2) group membership, and (3) Directors who are not family or group members. No person shall be denied membership because of race, color, religious belief or political convictions.

(a) *Family Membership.* Family membership shall be open to individual adults and their dependents upon application to the Association and approval of such application on such terms and conditions as the Board, acting on behalf of the Association, may establish.

Family membership shall be further conditioned upon the payment of capital dues in an amount to be determined by the Board, which shall be dedicated solely to the acquisition or construction of facilities of the

Association and shall be payable on such terms and conditions as the Board may establish from time to time.

(b) *Group Membership*. The Board of Directors may contract with labor unions, employers, trustees of welfare funds and other organizations or groups to provide services on a group basis on such terms and conditions as the Board may specify from time to time. Group members shall constitute those family units who subscribe for service under such contracts between the Association and groups of which such persons are members. Group members shall be entitled to service and all privileges of membership for the period, including renewals, during which the contract covering such group is in force.

*Section 2. Membership Voting*

Each family unit admitted to membership in the Association shall be entitled to one vote, provided that such member is a member in good standing. * * *

*Section 3. Meetings*

(a) *Time and Place*. A regular annual meeting shall be held within the first forty-five (45) days of each calendar year at such time and place as the Board of Directors shall determine. Special meetings may be called at any time by the President, or by a majority of the Directors, or by petition signed by one percent (1%) or more of the members and filed with the Secretary. * * *

(b) *Quorum*. At any meeting of the members, fifty (50) members or twenty-five percent (25%) of the membership, whichever is less, shall constitute a quorum. * * *

*Section 4. Expulsion of Members*

Any member of this Association may be expelled upon two-thirds vote of the entire Board of Directors, after fair notice and hearing. Any member so expelled shall have the right to appeal at the next succeeding regular meeting of the members or at any special meeting called for that purpose; provided that he gives the Secretary written notice of appeal within thirty (30) days after notice of expulsion is delivered or mailed to him. His expulsion shall be confirmed, or reinstatement effected, by majority vote of the members present at such a meeting. Grounds for expulsion shall be neglect or refusal to comply with the By-Laws of the Association or with any regulation promulgated by the Board of Directors.

## ARTICLE II

### BOARD OF DIRECTORS

*Section 1. Composition*

(a) The affairs of the Association shall be managed by a Board of Directors of fifteen (15) directors representing geographical districts (district directors). One additional director shall be appointed by members of every group composed of not fewer than fifty (50) members and constituting at least ten percent (10%) of the total membership of the Association. The Board of Directors shall appoint five (5) additional directors, to be known as directors at large, who shall serve for terms of one (1) year.

(b) District directors need not be members of the Association. * * * District

directors shall be elected by the membership-at-large at the annual membership meeting until the number of enrolled members, including group members, residing within a geographical district exceeds one hundred (100). Thereafter and for so long as there are one hundred (100) or more family units residing in such geographical district, the district director shall be elected by the members residing within such geographical district. The terms of district directors shall be for staggered terms of three years, provided that the terms of the initial Board of Directors shall be established by resolution prior to the 1973 annual membership meeting.

(c) Group directors shall be selected by the group to serve for a term coinciding with the duration of the group contract, provided that the term of any group director shall not exceed three years.

\* \* \* \* \* \* \*

*Section 3. Powers of the Board of Directors*

In addition to the powers of the Board of Directors conferred by the provisions of RCW Title 24 as further defined and limited in the Articles of Incorporation, the Board of [illegible] Association shall have the power—

(a) To contract with labor unions, trustees of welfare funds and other organizations or persons desiring to take service on a group basis from the Association, to provide for the application of any excess payments made for such service over costs, as determined by the Board, to the payment of entrance and membership fees in the Association and to provide for group payment of amounts specified by the Board in lieu of individual capital dues.

(b) To make any services regularly furnished by the Association available to the general public in such manner as the Board may provide \* \* \*

\* \* \* \* \* \* \*

*Section 7. Membership Districts*

There shall be fifteen (15) membership districts. The boundaries of the districts shall be established in the first instance by resolution of the initial Board of Directors. In establishing the boundaries of the district the board may consider any factor which it deems to be relevant to the best interests of the Association except that to the greatest practicable extent all districts shall contain the same number of residents. From time to time the board shall modify the boundaries of the districts to reflect changes in demographic patterns as revealed by the results of the national decennial census.

*Section 8. Removal of Directors*

The members who selected a Director may remove him at any regular meeting of such members, or at any special meeting of such members called for that purpose, if notice has been given as hereinafter provided. \* \* \*

## ARTICLE V

### Non-Profit Administration

All proceeds of the Association over costs of operation, including payments to physicians and other employees, shall be devoted to the acquisition, construction or improvement of structures or facilities [illegible] to improve

and extend the services of the [illegible], and no one shall receive any pecuniary gain or profit by reason of his membership herein.

## ARTICLE VI

### AMENDMENTS

*Section 1. Amendment by Board*

The Board of Directors may alter, amend or repeal these By-Laws by vote of a majority of those voting thereon at any regular or special meeting of the Board.

*Section 2. Amendment by Membership*

The members may alter, amend or repeal these By-Laws at a regular or special membership meeting in the following manner: * * *

By resolution adopted by the Association's board of directors on September 27, 1973, the Association declared its intent to qualify as an organization exempt from tax under section 501(c)(3) of the Code. Pursuant to this resolution a Form 1023 "Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code" was filed with the Internal Revenue Service in Seattle on or about December 20, 1973. Prior to filing the Form 1023, and in preparation for the review of petitioner's organization and operations which that application would necessarily entail, the Association passed certain resolutions (as well as making the amendments to its articles noted above). These resolutions were adopted on October 25, 1973, and are quoted below in material part:

### RESOLUTION 39

\*     \*     \*     \*     \*     \*     \*

BE IT RESOLVED that an early and continuing research activity of the Sound Health Association be an analytical study of our present and future treatment programs for individuals and groups of individuals to provide a solid basis for adjusting the medical treatment programs of patients so that maximum benefit can be achieved by application of the above resources.

BE IT FURTHER RESOLVED that the Association begin the development of such a research program that will lead to better utilization of health and medical resources through the implementation of a computerized information system. The goals of the program should be to provide a system which gives practicable arrays of data for the efficient administration of health care plans; assists in the evaluation of the effectiveness of patient care by identifying requirements for and changes needed in the components of care (e.g. health manpower, capital, organization of resources, etc.); and serves as a foundation for special research studies into genetic, environmental, occupational, or other factors influencing the utilization and delivery of health services, as well as costs related to those services.

RESOLUTION NO. 40

\*　　\*　　\*　　\*　　\*　　\*　　\*

BE IT THEREFORE RESOLVED that Sound Health Association does hereby establish a public health program, including regularly scheduled forums, for members of the community. The program is not intended to be a promotional vehicle for Sound Health Association but is offered as a public service in the belief that it will contribute to the health and welfare of the community. Recognizing the changing patterns of society and the resulting changes in peoples' needs, the program will be evaluated from time to time in its format, frequency, and subject matter.

RESOLUTION NO. 42

\*　　\*　　\*　　\*　　\*　　\*　　\*

1. Sound Health Association will provide professional medical services for persons who are not members of Sound Health Association who are critically ill and require emergent care and who are financially unable to pay the full cost of such care, when such services are available in the Health Care Center and may be performed during regular clinic hours.

2. No charge will be made to such persons for emergent care when they are financially unable to pay for such care.

RESOLUTION NO. 43

BE IT RESOLVED that there be established in Sound Health Association a fund which is to be used for subsidizing the dues on an annual basis for those who are unable to pay the full cost of the monthly dues. This fund is to be known as the "Supplemental Dues Program Fund." The allocations for dues subsidies are to be given annually on an individual basis without regard to race, creed, or sex. All or part of the membership deposit will be postponed during this period of assistance.

The amount of funds to be disbursed per year will be determined by the amount of funds contributed for this purpose by private individuals, foundations, business, fraternal and labor organizations.

Applicants must follow the same process as others joining Sound Health Association on a non-group individual basis and no special designation will be placed on these persons. The membership rights of those covered under this program are the same as any non-group individual member. Membership deposits may be postponed at the discretion of a review committee of the Board of Directors.

Allocations from this fund will be made by a committee appointed by the Board. The allocations will be reviewed annually and adjusted accordingly. Operating procedures of this committee shall be presented to the Board of Directors for approval.

On February 4, 1974, the Association received a letter from the Group Manager, Exempt Organization Branch, Internal Revenue Service, Seattle, Wash. The letter indicated that the Service felt that the Association's "powers and purposes are too

broad to meet the organizational requirements for exemption under section 501(c)(3) of the Internal Revenue Code in that they are not limited exclusively for and in furtherance of charitable, educational, religious, scientific or literary purposes or for the prevention of cruelty to children or animals." The letter then suggested that an amendment limiting the Association's powers and purposes be made in aid of the Association's section 501(c)(3) application. Finally, the letter requested additional data on the Association, which data was sent to the respondent's Seattle office on February 11, 1974, and which is included in the record.

On February 8, 1974, the petitioner received another letter from the Group Manager of the Exempt Organization Branch reversing his stand of 4 days before. The letter stated in material part that "Further consideration has been given to the 'purposes' set forth in Article III. It is determined that a change is not required." On February 20, 1974, the Association was told by letter from the Seattle office that its application was being transferred for review and ruling to the Assistant Commissioner (Technical), Internal Revenue Service, Washington, D.C.

By letter dated March 19, 1974, the Association received a preliminary determination rejecting the Association's application for exemption under section 501(c)(3). The letter stated, in material part, that the Associations's application was being rejected because:

> The operation of the prepaid plan is supported by the premium paid by subscribers. There is no donative element present in the operation of the plan. Further, the services provided are for subscribers only. Thus, the broad public benefit necessary to characterize the activity as charitable is absent.
>
> Accordingly, you are not organized and operated exclusively for charitable purposes within the meaning of section 501(c)(3) of the Code. Therefore, you do not qualify for recognition of exemption under section 501(c)(3). You are required to file Federal income tax returns.

This ruling was protested by letter dated April 5, 1974.

On or about June 21, 1974, as an alternative to its section 501(c)(3) qualification, the Association filed a Form 1024 "Exemption Application" requesting a ruling that the Association qualified under section 501(c)(4). This application received favorable action. On July 16, 1974, the Association was notified by letter that it qualified under section 501(c)(4) of the Code.

On April 27, 1977, the Association received what was termed a final adverse ruling with respect to its section 501(c)(3)

application from the Chief, Rulings Section 2, Exempt Organizations, Technical Branch. The letter stated in relevant part:

> This is a final adverse ruling with respect to your exempt status under section 501(c)(3) of the Internal Revenue Code:
>
> Our adverse ruling was made for the following reasons:
>
> Although you will provide some health services to the general public, it is clear that preferential treatment will be accorded to your member-subscribers. This characteristic is incompatible with the requirement of section 1.501(c)(3)–1(d)(1)(ii) of the Income Tax Regulations, that an organization must serve a public rather than a private interest in order to qualify under section 501(c)(3) of the Code.
>
> In addition, the effect of your prepayment feature is to provide a form of insurance for your member-subscribers. This is not in furtherance of a public charitable purpose.
>
> Although you are not exempt under section 501(c)(3) of the Code, you are still exempt under section 501(c)(4). Our ruling letter dated July 16, 1974 will remain in effect.

Upon receipt of this final determination, petitioner had exhausted its administrative remedies.

The general outline of the Association which emerges from a review of the record is of a nonprofit, nonstock corporation, owned by its members,[2] whose primary, but not sole purpose is to provide a wide range of health care services to its members. The Association's goal is to provide comprehensive health care services to all members and the community. The Association is not part of a group practice arrangement whereby it contracts with a third party partnership of physicians for the partnership to provide health care services to its members. The Association is itself the health care service provider. The Association employs salaried physicians, nurses, and "medexes" who then provide directly to its members the health care services for which its members have contracted. In addition, the Association contracts with other basic health care service and supply providers, like hospitals, pharmacies, radiologists, laboratories, etc. (what we might call "secondary health care service providers"), to provide services and supplies to the Association members. Almost all of the Association's services are centered at the Association's clinic. The physician's and secondary health care service provider's salaries and fees are set by contract between the secondary provider and the Association. Once a compensation level is

---

[2]The Association's members are those persons entitled to receive health care benefits from the Association under contracts with the Association.

established by contract, the amount of compensation does not vary and is not related to the number of patients enrolled or treated, the number or nature of services performed, or the status of the patient as being member or nonmember, or in the receipt of free health care.

In return for the Association's undertaking to provide the above-described services and facilities, the members of the Association agree to make certain periodic payments to the Association. These payments are based, in amount, on a "community rating" system. Everyone who is accepted as a member pays the same rates. These payments to the Association are made monthly and do not vary except as every member's premium varies—regardless of the amount or services provided, or not provided, to the individual members.

As appears from the Association's bylaws, the Association has three types of "members," (1) group members, (2) family or individual members, and (3) "directors." Group members are those who belong to a group which has, as a group, contracted with the Association. Most often, group members are all those employees of a particular employer who have opted to join the Association in lieu of choosing employer-provided health insurance or Blue Cross/Blue Shield coverage. The Association will contract with any group having three or more members. "Individual" or "family" members are those who are not members of any group, but who have contracted as individuals with the Association for the provision of health care services to themselves and their families. Any adult in the Association's enrollment area can apply for individual membership, although there appear to be periodic hiatuses in individual member enrollments. Directors, who are not group or individual members, constitute the third group.

There are minor differences in privileges and obligations, unrelated to the quality and amount of medical care services provided, between group and individual members of the Association. Individual, but not group, members must pass a health examination in order to qualify for membership. This requirement presumably fulfills the same function with respect to individual members that the "pre-existing condition" limitation, discussed below, fulfills with respect to group members. Further, individual members are requested to make "capital dues" payments totaling $200 in addition to their monthly

subscription payments, while group members need make no such "contributions."[3]

The Association handles the problem of high risk with respect to group members by way of a "pre-existing condition"[4] limitation in the Association Group Health Care Service Agreement (group contract). The preexisting condition limitation for group members can be waived upon the satisfaction of certain conditions. These conditions include (1) being covered under the group contract for at least 12 months, (2) carrying out such treatment as is recommended by the Association physician attending, (3) satisfying the current Association "Medical Evaluation Standards" (i.e., passing an entrance physical the same as an individual member), and (4) paying any applicable medical evaluation fee. Besides these differences noted, individual and group members have the same membership privileges and receive essentially the same range of health benefits and services. In the absence of evidence to the contrary, we must assume that directors are subject to the same requirements and limitations as group members.

It is clear that the Association emphasizes group membership in its program design, service delivery, and enrollment functions. It appears that the Association expects a gradually increased individual enrollment as the years go by. The record shows that the Association's minimum enrollment projections, as of the end of 1973, anticipated that the percentage of individual members to all members would increase from 12.86 percent during the Association's first year of operation to 13.14 percent in its sixth year of operation. These same projections anticipated that Medicaid and charity care patients would increase by 350 percent and 280 percent, respectively, or from 1,000 Medicaid and 65 charity cases in year one, to 3,500 Medicaid and 185

---

[3]The individual member's capital dues contribution is a one-time payment and can be made in installments of $50 on enrollment and $50 per year thereafter until finally paid. These "dues" are represented by a membership certificate and are refundable, without interest to the member paying them, within 5 years of the day in which that member gives up his membership in the Association. The proceeds of the sale of these certificates are earmarked exclusively for capital purposes. Individual members are told that they are required to make these contributions to the Association because of (1) the higher administrative costs associated with individual membership and (2) the "somewhat greater utilization of services inherent in * * * [individual] membership."

[4]A "pre-existing condition" is defined with respect to the Association's group members in the group contract as being any condition for which a person has received medical treatment or has had medical treatment recommended by a physician within 5 years prior to the date of application to the Association for membership.

charity care patients in year six. In year one, 33.73 percent of all the persons seen by the Association were expected to be Medicaid enrollees and 2.19 percent were expected to be charity patients. In year six, 14 percent of all patients were expected to be Medicaid enrollees and 0.7 percent were expected to be charity patients.[5]

The rights attaching to membership in the Association include not only the right to medical care for the subscriber and those of his immediate family who are enrolled in the plan and for whom dues are paid, but also include the right to vote for and remove the directors of the Association. When the record was made, toward the end of 1973, it was intended that each director represent 1 of 15 geographical areas known as districts. Each district would need to contain at least 100 voting members before it could elect a director. Before a district had the required number of votes, that district's director would be elected by the Association's members-at-large. After it was elected, the board of directors as then constituted would then itself elect five other

---

[5]

SOUND HEALTH ASSOCIATION
PROJECTED ENROLLMENT

(Minimum)

| | | Enrollment at beginning of year | | | | |
|---|---|---|---|---|---|---|
| | 1st year | 2d year | 3d year | 4th year | 5th year | 6th year |
| Fee for service | 1,235 | 2,470 | 2,756 | 3,040 | 3,325 | 3,515 |
| SHA Plan: | | | | | | |
| Individual | 200 | 400 | 595 | 1,190 | 1,680 | 2,100 |
| Group | 428 | 1,995 | 5,400 | 7,650 | 8,640 | 11,250 |
| High Option Plan: | | | | | | |
| Individual | 14 | 28 | 105 | 210 | 420 | 700 |
| Group | 22 | 105 | 600 | 1,350 | 2,160 | 3,750 |
| Medicaid | 1,000 | 2,000 | 2,625 | 3,500 | 3,500 | 3,500 |
| Charity care | 65 | 130 | 144 | 160 | 175 | 185 |
| Total without fee for service | 1,664 | 4,528 | 9,325 | 13,900 | 16,400 | 21,300 |

[The totals shown above for these columns include (1) the "Sound Health Association (SHA) Plan" and "High Option Plan" enrollees, both individual and group, and (2) the projected "Medicaid" enrollees. The exclusion by the chart's author of "charity care" patients from the total of nonfee for service enrollees is unexplained.]

| Total with fee for service | 2,964 | 7,128 | 12,225 | 17,100 | 19,900 | 25,000 |

[Those enrollees included in the "fee for service" category are the "fee for service" enrollees and the "charity care" enrollees.]

| Fee for service % | 44% | 36% | 24% | 19% | 18% | 15% |

Note—A fee for service or charitable care "member," is considered to be equivalent of four office visits per year.

The projections of individual nongroup members do not reflect the addition of the subsidized dues program recipients because the projections were based on an anticipated enrollment to the buying public and the amount of contributions to be received is unknown. There is no excess income during the first few years of operation to guarantee any minimum number of subsidized dues enrollees.

directors-at-large for 1-year terms. At the time the record was constituted, the board members were prominent members of the community who received no payment for their services on the board. A further right of group membership is a grievance procedure for disputes between the Association and its members, other than those involving medical malpractice, personal injury, and wrongful death, which includes binding arbitration.

The Association provides a variety of services to its members—and to nonmembers—through its outpatient clinic in Tacoma, Wash. The clinic opened for business in October 1973. By the end of 1973 the clinic had a staff of two physicians and a "medex." On December 1, 1973, the Association had a "courtesy staff" of 16 physicians. The "courtesy staff" was composed of physicians who had indicated that they would serve the Association staff physicians on a referral fee-for-service basis. No physicians who had applied had, as of that date, been refused privileges on the courtesy staff.

Upon opening its clinic, the Association began to treat patients. Between October and December of 1973, approximately 50 percent of the clinic's patients were Medicaid patients (treated, it appears, on a fee-for-service basis) and 25 percent were students from a local university seen under a contract with the university. Also in 1973, the Association opened its clinic to the nonmember public on a fee-for-service basis, and began providing emergency care, within the clinic's capabilities and within normal clinic hours, to those who needed it whether member or not and without regard to the patient's ability to pay. At about this same time, the Association informed the ambulance company with which it had contracted that the Association would treat *any* emergency patient, nonmember as well as member.

During these months, the Association also began planning a "subsidized dues" program directed at those who would want to join the Association, but who would (1) not be members of a group contracting with the Association, and (2) who, while having more financial means than is allowed for Medicaid eligibility, would still not have enough money to pay the full Association dues. This program was designed to allow the Association to admit such a person as an "individual" member with all the rights concomitant to such status but at a lower monthly fee than is charged the general individual membership.

The program was to work by waiving the applicant's $200 capital subscription, and reducing his monthly dues payments. Financial support for this program was to come from a trust fund to be established or from direct gifts. The funds set aside for this purpose would then be credited to each qualifying member's account in amounts necessary to make up the difference between the amount of his payment and the full dues amount. The amount credited to any account at any one time would vary depending on the amount of need and the money available.

As found above, the services and benefits offered to the group and individual members are substantially the same. For this reason perhaps, only a copy of the group service contract, called the Group Health Care Service Agreement, was included in the record. From this document it would appear that a wide range of services, from in-clinic and in-hospital, to extended care convalescent home services are offered to group members. Once a group member is enrolled in the plan, he can remain a member of the Association until he reaches age 65, as long as he retains membership in a group and pays all fees and charges made to him. After age 65, the member can continue coverage under the Association's "Senior Plan." The "Senior Plan" is integrated with the medical and hospital benefits provided by the Medicare laws. In this arrangement, which might be analogized to an "integrated" pension or profit-sharing plan, the Association agrees to supplement the benefits available under Medicare to the extent necessary to provide the same level of care to the "Senior Plan" members as is provided under the basic plan. Thus, the Medicare recipient makes monthly payments to cover those of the Association's charges which exceed the payments received from the Federal Government. The senior plan enrollee is obligated to maintain Medicare qualification as a condition precedent to continued membership eligibility. If the senior plan member defaults in this respect, he will be charged on a fee-for-service basis for all the services provided by the Association which would otherwise have been covered by Medicare.

Besides the basic Sound Health Plan, the Association has a high option plan which includes all the services of the basic plan, plus additional benefits. Some of the additional benefits offered include maternity care without the usual additional maternity

fee, provision of all prescribed drugs and medicines without additional cost, and a limited amount of mental health care services.

The group plan also provides a group conversion plan option available to those group members whose eligibility for group membership is terminated for some reason other than the member's personal default. This plan enables the group member to continue his membership in the Association even after his group has terminated its contract with the Association or the member has terminated his employment with the group employer, so long as the member applies for membership under the group conversion plan within the allotted time.

By the beginning of 1974 the Association had many of these programs operational. From mid-October 1973 to the end of that year, the association provided free care by adjustments in rates to fee-for-service nonmember patients amounting to $158.50. In the first month of 1974, the Association provided full services to several fee-for-service nonmember patients without charge and provided services at adjusted rates to several such patients who were unable to pay the full charge. Also, in January of 1974, the Association began receiving, and rendering free care to, referral patients from a family clinic. After 1973 it was intended to devote a fixed percent of the Associations's gross income to emergency-charity patients.

By the beginning of 1974, the Association had begun a "public health forum program" at its new clinic. This was an educational program designed to set up forums to discuss such things as health care costs, health care delivery, obesity, "metabolic diseases," etc. It was intended at that time that these programs should be ongoing. It was also intended that each program would be presented to the public by a person qualified in the area and that the programs would be responsive to requests by the community for programs on particular subject matters.

The Association's original financing came by way of $266,548 worth of loans from the Department of Health, Education, and Welfare. These loans were made to the Association for the purposes of allowing it to plan and develop a Health Maintenance Organization (HMO). Throughout the record the Association refers to its intent to qualify under any HMO Act passed by Congress. Throughout its literature, the Association refers to itself as being an HMO.

While the Association's first financing came from Government loans, primary long-range financing for all these programs and services was, as of late 1973 and early 1974, to come from members' monthly subscription payments and long-term mortgages. It is the Association's intent to become self-sufficient. To do so it must rapidly increase its membership in the future. Once sufficient membership is obtained, the Association can be self-financing. In the meantime, additional financing is to come from the $200 subscription agreement capital dues assessment on individual members and from the issue of $500,000 worth of 7-percent and 8-percent 1973 series subordinated debentures. As of the end of 1973, these debentures were to be sold to the public by Association members and employees. Authorized by the Association's board of directors on March 22, 1973, the 1973 series bonds are due on or before July 1, 1981. These debentures are to be subordinated to all present and future mortgages or pledges of real or personal property of the Association. The repayment of the loans represented by the debentures is to be secured by a sinking fund. Additional money will be earned by the fee-for-service charges made to the nonmember public using the Association's facilities. Finally, it is hoped that additional financing will come through tax-deductible gifts solicited from charitably minded groups, foundations, and individuals.

We now turn to an analysis of the substantive issue for decision; does petitioner qualify as an exempt organization described in section 501(c)(3). In pertinent part section 501 provides:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle * * *

\* \* \* \* \* \* \*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for * * * charitable * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in * * * any political campaign on behalf of any candidate for public office.

Section 1.501(c)(3)–1(d)(1), Income Tax Regs., supplies part of the respondent's explication of the above requirement as follows:

(d) *Exempt purposes.*—(1) *In general.* (i) An organization may be exempt as an organization described in section 501(c)(3) if it is organized and operated exclusively for one or more of the following purposes:

  *    *    *    *    *    *    *

(*b*) Charitable

  *    *    *    *    *    *    *

(ii) An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

In his final adverse letter of April 27, 1977, the respondent ruled that petitioner does not fall within the above statutory and regulatory language because:

Although you will provide some health services to the general public, it is clear that preferential treatment will be accorded to your member-subscribers. This characteristic is incompatible with the requirement of section 1.501(c)(3)–1(d)(1)(ii) of the Income Tax Regulations, that an organization must serve a public rather than a private interest in order to qualify under section 501(c)(3) of the Code.

In addition, the effect of your prepayment feature is to provide a form of insurance for your member-subscribers. This is not in furtherance of a public charitable purpose.

That our task is to render an analysis only of the reasons set forth by respondent is clear from the following quote from the Report of the Committee on Finance, S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 626:

The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new argument which the Service may wish to introduce at the time of the trial. * * *

The Service made no new arguments at trial. Comparably clear is that the burden lies on petitioner to show that the respondent erred in his reasoning. Rule 217(c)(2).

We do note at the outset that there is some controversy between the parties with respect to what is contained in the administrative record. It is a fact that petitioner received a

ruling dated July 16, 1974, granting it status as a "social welfare organization" within the meaning of section 501(c)(4). It appears that no additional information with respect to the desired section 501(c)(3) status was proferred by petitioner or solicited by respondent between that July 1974 date and April 27, 1977, the date of the final adverse letter.

Respondent objects to the fact that petitioner, while contending that the Court has before it all significant facts, makes "frequent" reference to its status as a health maintenance organization (HMO) under Title XIII of the Public Health Service Act, 42 U.S.C.S. sec. 300e et seq. (Supp. 1976), as amended in 1976. Respondent concedes that the facts in the administrative record should be found as broadly as possible in order that the instant decision can serve as a useful precedent. There is no question that the administrative record reflects that, at the time petitioner applied for exemption, it was being financed by a grant from the Department of Health, Education, and Welfare for the purpose of developing an HMO. The record does not support, however, petitioner's representation that its current qualification under the HMO Act requires it to operate currently in a certain manner. While petitioner qualified as an HMO under the Public Health Service Act, *supra*, sometime in 1973, that Act was amended in 1976 to provide for varying requirements for the operation of qualifying organizations depending upon their age. 42 U.S.C.S. sec. 300e et seq. (Supp. 1976). Hence, we make no finding with respect to petitioner's current operations vis-a-vis the HMO Act.

Turning to the statute at issue we are mindful that neither the furnishing of medical care in general nor the operation of a hospital, or HMO in particular, is specifically listed as a qualifying exempt activity within the meaning of section 501(c)(3). Thus, the providing of medical services must fall, generally speaking, within the words "charitable purpose" to be exempt.

While the term "charitable" is not specifically defined in the Code, it is used there in its generally accepted legal sense. Sec. 1.501(c)(3)–1(d)(2), Income Tax Regs. In determining what is charitable in the generally accepted legal sense, the courts have looked to the law of charitable trusts. See, e.g., *Green v. Connally*, 330 F. Supp. 1150 (D.D.C. 1971), affd. per curiam sub

nom. *Coit v. Green,* 404 U.S. 997 (1971). A leading treatise states the proposition thusly,

A trust for the promotion of health is a charitable trust. The only reference to this purpose in the Statute of Charitable Uses is the inclusion of trusts "for maintenance of sick and maimed soldiers and mariners." The cases in which trusts for the promotion of health have been upheld as charitable trusts are numerous. They include trusts to establish or maintain a hospital or a ward or a bed in a hospital; to furnish nurses to attend the poor; to increase medical knowledge by research or otherwise; to remove the causes of the spread of disease, as by draining swamps. Frequently, of course, a trust for the promotion of health may be also a trust for the relief of poverty, or a trust for the advancement of education. Thus a trust to afford medical assistance to the poor, or a trust for medical research, is charitable. *A trust for the promotion of health, however, is none the less charitable although the benefits are not limited to the poor. Thus a trust to establish a hospital for all persons whether rich or poor is charitable.* Most hospitals, indeed, are of this character. Moreover, trusts for the increase of medical knowledge by research are unconnected with the relief of poverty. [4 A. Scott, Trusts, sec. 372, pp. 2893–2896 (3d ed. 1967). Fn. ref. omitted; emphasis added.]

Thus, while there may be a distinction between trusts for the relief of poverty and trusts for the promotion of health, both have been considered charitable. This has been the view of respondent as announced in Rev. Rul. 73–313, 1973–2 C.B. 174, and Rev. Rul. 69–545, 1969–2 C.B. 117, and the opinion of the Court of Appeals for the District of Columbia as expressed in *Eastern Kentucky Welfare Rights Org. v. Simon,* 506 F.2d 1278 (D.C. Cir. 1974), vacated on other grounds 426 U.S. 26, 46 (1975). As that court stated (506 F.2d at 1287):

The term "charitable" is thus capable of a definition far broader than merely the relief of the poor. The law of charitable trusts supports the broader concept. The question involved here then is whether the term "charitable" as used in section 501(c)(3) may be broadly interpreted as was done in Revenue Ruling 69–545 or is to be restricted to its narrow sense of relief of the poor.

We cannot conclude, as did the district court, that Congress intended the latter construction. While it is true that in the past Congress and the federal courts have conditioned the hospital's charitable status on the level of free or below cost care that it provided for indigents, there is no authority for the conclusion that the determination of "charitable" status was always to be so limited. *Such an inflexible construction fails to recognize the changing economic, social and technological precepts and values of contemporary society.* [Emphasis added.]

Therefore, having determined without difficulty that the rendering of medical care is a charitable activity, it is reasonable to conclude that the tests applied to determine the status of a

hospital are relevant to a determination of the status of an HMO. Clearly, both types of organizations must qualify as charitable under section 501(c)(3) on the basis of the health care services that they provide. Accordingly, we note that respondent, in his regulations explaining closely related section 170, defines "hospital," for purposes of the higher percentage limitation in the case of charitable contributions to such entities, as including a rehabilitation center, *outpatient clinic*,[6] or community mental health or drug treatment center, so long as the clinic or center's "principal purpose or function is the providing of medical or hospital care." Sec. 1.170A–9(c)(1)(ii), Income Tax Regs. In interpreting this regulation, for purposes of determining whether an organization qualifies under the exclusion of section 4235(h), the respondent ruled that a nonprofit community health care center that provided outpatient medical and general health care services qualified as a "hospital." Rev. Rul. 73–131, 1973–1 C.B. 446.

This broad approach to the definition of "charitable" of Rev. Rul. 69–545, *supra*, and *Eastern Kentucky Welfare Rights Org. v. Simon, supra*, was not always the state of the law. The law's approach to charitable hospitals has gone through a metamorphosis in recent years. See R. Bromberg, "The Charitable Hospital," 20 Cath. Univ. L. Rev. 237, 241–251 (1970). An earlier approach is demonstrated by respondent's Rev. Rul. 56–185, 1956–1 C.B. 202, 203, where the respondent listed as one of the requirements for the charitable qualifications of a hospital, that:

> *It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay.* It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. * * * [Emphasis added.]

This approach generally defined a charitable hospital as one for

---

[6]The analogy between an outpatient clinic and part of the services rendered by an HMO clinic seems clear enough.

the relief of the poor, although the "extent of its financial ability" standard was vague and difficult of application.

It can fairly be said that the earlier narrow approach required that the care of indigent patients be the primary concern of the charitable hospital, as distinguished from the care of paying patients, and that consequently the hospital had to rely to some extent on philanthropic contributions from the public to finance its operations. This circumstance stems from the fact that the hospital was originally an almshouse greatly dependent on philanthropy for its daily operations. *Eastern Kentucky Welfare Rights Org. v. Simon*, 506 F.2d at 1288. Even though the belief that some form of relief to the poor is a condition precedent to the charitable status of a hospital, or at least the extent of such relief (cf. *Sonora Community Hospital v. Commissioner*, 46 T.C. 519, 526 (1966)), may now be in question, we recall that one of the reasons stated by respondent in his preliminary determination letter for refusing section 501(c)(3) status to the petitioner was that "There is no donative element present in the operation of the plan." Besides being factually wrong (see below), this conclusion was not free from doubt as a matter of law. We can only speculate that this doubt caused respondent to drop that contention from his final determination letter.

Such a restricted view of a hospital does not comport with the way that modern hospitals are operated. The hospitals of today are no longer almshouses. Caring for paying patients is the primary concern for nearly all of today's hospitals. Today, a combination of the steady rise in patients' incomes and, more importantly, the growth of such resources as health insurance, Medicare, Medicaid, and other Government programs, has rendered the policy, which restricts the "charitable" classification to donative institutions, an anachronism. While philanthropy still plays an important role in charitable hospital capital accumulation, it is no longer the primary source of hospital income.[7] We have passed beyond the point of needing to worry exclusively about hospital financing. We can now also turn our attention toward a policy of insuring that adequate health care

---

[7] In 1972, philanthropic contributions to health care institutions totaled an estimated 3.68 billion dollars. Philanthropists provided funds for over 4 percent of total health costs and about 30 percent of private construction costs. American Hospital Association Fund Raising Council, Giving USA: 1973 Annual Report 34.

services are actually *delivered* to those in the community who need them.[8]

The respondent recognized these changes in the composition of this country's health care delivery system and amended his stand as stated in Rev. Rul. 56–185, *supra,* in Rev. Rul. 69–545, *supra.*[9] The respondent's present approach might be described as the "community benefit" approach. A charity will benefit the community if the class served is not so small that its relief is not of benefit to the community. This concept has been stated as follows:

A trust is not a charitable trust if the persons who are to benefit are not of a sufficiently large or indefinite class so that the community is interested in the enforcement of the trust. This is true even though the purpose of the trust is to promote health. * * * [4 A. Scott, *supra,* sec. 372.2 at p. 2897.]

The requirement that the community must benefit from a charity's activities has, as its natural corollary, that private interests must not so benefit in any substantial degree.

In the context of community service we detect from the fact that respondent reached opposite conclusions in his Rev. Rul. 69–545, *supra,* with respect to the two hospitals at issue, that the

---

[8]The Court of Appeals in *Eastern Kentucky Welfare Rights Org. v. Simon,* 506 F.2d 1278, 1288–1289 (D.C. Cir. 1974), vacated on other grounds 426 U.S. 26 (1975), stated the problem as follows:

"Hospitals in the early part of this nation's history were almshouses supported by philanthropy and serving almost exclusively the sick poor. Today, hospitals are the primary community health facility for both rich and poor. Philanthropy accounts for only a minute percentage of the hospital's total operating costs. Those costs have soared in recent years as constant modernization of equipment and facilities is necessitated by the advances in medical science and technology. The institution of Medicare and Medicaid in the last decade combined with the rapid growth of medical and hospital insurance has greatly reduced the number of poor people requiring free or below cost hospital services. Much of that decrease has been realized since the promulgation of Revenue Ruling 56–185 * * * Thus, it appears that the rationale upon which the limited definition of "charitable" was predicated has largely disappeared. *To continue to base the "charitable" status of a hospital strictly on the relief it provides for the poor fails to account for these major changes in the area of health care.* [Emphasis added.]"

[9]Rev. Rul. 69–545 is a modification, not revocation, of Rev. Rul. 56–185. Rev. Rul. 69–545, *supra,* 1969–2 C.B. at 119. The effect of Rev. Rul. 69–545 was "to remove * * * [from the rule of Rev. Rul. 56–185] the requirements relating to caring for patients without charge or at rates below cost." The effect of this modification was to create two standards by which a hospital could qualify for exempt status: (1) The community benefit standard of Rev. Rul. 69–545, which bases exemption on whether the organization benefits the community by making available emergency room services to all and furnishing other hospital services to patients able to pay, either directly or through third party reimbursement, and (2) the financial ability standard of Rev. Rul. 56–185, which bases exemption on whether the organization operates to the extent of its financial ability for those unable to pay.

operation of an emergency room on an open, active basis is, in his mind, an important element.[10] To appreciate fully respondent's view we quote rather extensively from Rev. Rul. 69–545, *supra*, 1969–2 C.B. at 117.

Hospital A is a 250-bed community hospital. Its board of trustees is composed of prominent citizens in the community. Medical staff privileges in the hospital are available to all qualified physicians in the area, consistent with the size and nature of its facilities. The hospital has 150 doctors on its active staff and 200 doctors on its courtesy staff. It also owns a medical office building on its premises with space for 60 doctors. Any member of its active medical staff has the privilege of leasing available office space. Rents are set at rates comparable to those of other commercial buildings in the area.

*The hospital operates a full time emergency room and no one requiring emergency care is denied treatment. The hospital otherwise ordinarily limits admissions to those who can pay the cost of their hospitalization, either themselves, or through private health insurance, or with the aid of public programs such as Medicare.* Patients who cannot meet the financial requirements for admission are ordinarily referred to another hospital in the community that does serve indigent patients.

The hospital usually ends each year with an excess of operating receipts over operating disbursements from its hospital operations. Excess funds are generally applied to expansion and replacement of existing facilities and equipment, amortization of indebtedness, improvement in patient care, and medical training, education, and research.

[Emphasis added.]

In contrast, hospital B was described as:

a 60-bed general hospital which was originally owned by five doctors. The owners formed a nonprofit organization and sold their interests in the hospital to the organization at fair market value. The board of trustees of the organization consists of the five doctors, their accountant, and their lawyer. The five doctors also comprise the hospital's medical committee and thereby control the selection and the admission of other doctors to the medical staff. During its first five years of operations, only four other doctors have been granted staff privileges at the hospital. The applications of a number of qualifed doctors in the community have been rejected.

Hospital admission is restricted to patients of doctors holding staff privileges. Patients of the five original physicians have accounted for a large majority of all hospital admissions over the years. *The hospital maintains an emergency room, but on a relatively inactive basis, and primarily for the convenience of the patients of the staff doctors. The local ambulance services have been instructed by the hospital to take emergency cases to other hospitals in*

---

[10]Respondent is not alone in his opinion. As early as 1966 the feeling was beginning to grow that the provision of an open emergency room should be a primary condition precedent to charitable qualification. J. Horty, "How Does Surplus Affect Tax Status?" 107 Modern Hospital, No. 1, pp. 40–42 (July 1966.)

*the area. The hospital follows the policy of ordinarily limiting admissions to those who can pay the cost of the services rendered.* The five doctors comprising the original medical staff have continued to maintain their offices in the hospital since its sale to the nonprofit organization. The rental paid is less than that of comparable office space in the vicinity. No office space is available for any of the other staff members. [Emphasis added.]

Hospital A was found qualified for exemption and hospital B was ruled nonexempt.

Having considered the more general question of what constitutes a charitable purpose within the purview of section 501(c)(3), we revisit the regulations in connection with the less esoteric statutory requirement that the entity be organized and operated exclusively for the exempt purpose.

In amplifying the organizational test, section 1.501(c)(3)–1(b), Income Tax Regs., emphasizes the organization's "articles of organization" (articles)[11] and provides a two-pronged test of whether an organization is "organized" exclusively for the required purposes:

Sec. 1.501(c)(3)–1(b) *Organizational test.*—(1) *In general.* (i) An organization is organized exclusively for one or more exempt purposes only if its articles * * *

(*a*) Limit the purposes of such organization to one or more exempt purposes; and

(*b*) Do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes.

If the organization's articles state its purposes in terms as broad, but no broader than those exempt purposes stated in the statute, it will have passed the organizational test. Sec. 1.501(c)(3)–1(b)(ii), Income Tax Regs.

Referring to the facts at hand, the Association's articles of organization clearly describe an organization which was organized exclusively for charitable purposes: (1) Providing health care facilities for the ill, (2) carrying on health educational activities, (3) carrying on scientific research in the health care area, and (4) promoting the general health of the community by "making available its services, resources, and facilities to those persons who may not be able to pay * * * and not exclusively to

---

[11]Articles of organization is defined as being "the corporate charter, the articles of association, or any other written instrument by which an organization is created." Sec. 1.501(c)(3)–1(b)(2), Income Tax Regs.

those who are members." Article Three, sec. 1(e). The Association's articles limit its purposes to "charitable" purposes and do not expressly authorize the Association to engage in activities which, in themselves, are not in furtherance of this exempt purpose. We hold that the Association readily passes the organizational test.

We pass then to the operational test. Section 1.501(c)(3)–1(c)(1), Income Tax Regs., emphasizes that the entity must "[engage] primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3)." It is the purpose toward which an organization's activities are directed that is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978).

While the record is somewhat lacking in its description of the Association's operations, there is sufficient evidence to show that the Association, like hospital A in the revenue ruling, was operated for charitable purposes. For the purpose of "accomplishing" its exempt purpose, and in compliance with its articles, the Association established programs and facilities remarkably like hospital A's programs and facilities. Like hospital A, the Association opened its emergency room to all persons requiring emergency care whether they were financially able to pay or not, and whether they were members or not, and decided to make no charge to indigents for such care. Resolution 42. The Association directed the ambulance company with which it contracts to bring all emergency patients to the clinic, regardless of membership, whom the clinic could reasonably handle given its facilities. We have noted the importance of this service to the community. The Association established a research program to help study better ways of delivering health care services. See Resolution 39. It established an education program. Resolution 40.

In an action *more* charitable than any undertaken by hospital A, the Association adopted a plan to establish a fund to receive contributions which would be used to help subsidize persons who wanted membership but who could not make the full monthly payments required for membership. Like hospital A, the Association's courtesy staff is open to all qualified physicians. No physician had been turned down for admission to that staff as of the time the Form 1023 herein was filed. Like hospital A, the

Association is in the hands of the board of directors made up of prominent citizens of the community. Unlike hospital A, the Association's board is elected from among the Association's owner/members.

The respondent objects to petitioner's membership form of organization. But it is the Association's particular form of membership organization that most qualifies it as an organization providing benefit to the community. The most important feature of the Association's membership form of organization is that the class of persons eligible for membership, and hence eligible to benefit from the Association's activities, is practically unlimited. The class of possible members of the Association is, for all practical purposes, the class of members of the community itself. The major barrier to membership is lack of money, but a subsidized dues program demonstrates that even this barrier is not intended to be absolute. The subsidized dues program seems designed for such persons as Medicare and Medicaid recipients, and all those of lesser means. If sufficient donations and other moneys can be accumulated to fund adequately the program, it will provide an additional benefit to the community. It is safe to say that the class of persons potentially benefited by the Association is not so small that its relief is of no benefit to the community. It, in effect, runs a substantial outpatient clinic as an important ingredient of its medical care services.

But the respondent claims that the net effect of the membership mode of operation is that it will result in "preferential treatment" to members. If any "preferential treatment" is given to Association members, then it is the preferential treatment common to every charitable organization that benefits the community by benefiting a certain class of individuals. To our knowledge, no charity has ever succeeded in benefiting *every* member of the community. If to fail to so benefit *everyone* renders an organization noncharitable, then dire times must lie ahead for this nation's charities.

If respondent's claim of preferential treatment is to have any impact at all, it must be based upon preferential treatment resulting in some private benefit. In the past, however, the concept of private benefit was limited to the situation in which an organization's *insiders* were benefited. For example, private benefit was found in Rev. Rul. 69–545, *supra*, in hospital B, because that hospital served as little more than the private

domain of the five physicians who founded and ran it for their own benefit.

The hospital B of Rev. Rul. 69–545 is in many respects similar to the hospital we dealt with in *Sonora Community Hospital v. Commissioner*, 46 T.C. 519 (1966). In that case we found that the community hospital there involved "was operated to a substantial degree for the benefit of its founding doctors, who together with their associates were the source of 90 percent of the patients treated at the hospital." *Sonora Community Hospital v. Commissioner, supra* at 526. Confronted with this clear case of insider benefit, we found that, on all the facts there present, the "petitioner was not operated exclusively for 'charitable' purposes within the requirements of the statute." *Sonora Community Hospital v. Commissioner, supra* at 526.

Again, in the case of *Leon A. Beeghly Fund v. Commissioner*, 35 T.C. 490 (1960), this Court upheld respondent's revocation of a foundation's exempt status, where the foundation's primary objective in entering into a business transaction was to benefit the stockholders of a particular business corporation, "with the objective of ultimately benefiting charities running a poor second." *Leon A. Beeghly Fund v. Commissioner, supra* at 518. "[T]he test is not ultimate profit or loss but whether, at every stage of the transaction, *those controlling* the exempt organization guarded its interest and dealt with related parties at arms length." (Emphasis added.) Exempt Organization Handbook (3 I.R.M. 7751), Part VII, 382.2(1). "[W]hen the interests of charity are sacrificed to the private interests of the *founder or of those in control*, exemption is precluded because the organization is being made to serve private interest." (Emphasis added.) Exempt Organizations Handbook (3 I.R.M. 7751), Part VII, 382.1(2).

In the Association's case there is neither a closed staff, nor restricted emergency room, nor any insider benefit of the sort that would disqualify the Association under section 501(c)(3).[12] See sec. 1.501(c)(3)—1(d)(1) (ii), Income Tax Regs. The extension of the "insider test" for private benefit to a community owned-and-operated HMO is not warranted under these facts. To equate an "insider" with potentially the whole community would

---

[12]If the directors are treated as group members, they may be allowed membership status without paying the required $200 for individual members, and without belonging to a group. Since the directors are elected from the community, however, and are not founders or insiders of a similar kind, we do not think this possibility to be fatal under those facts.

so gut the insider test as to transmogrify it from a test of some precision in distinguishing private benefit to a test of such general application as to be useless.[13]

The respondent represents on brief that his view of the charitable hospital has not changed since the publication of Rev. Rul. 69–545, *supra*. As mentioned, hospital A in that ruling ordinarily restricted admission to those who could pay, either by themselves or by way of a third party, such as an insurance company, Medicare, or Medicaid. Indigent patients without such resources were usually referred to another hospital. Thus, it is respondent's position, with which we agree, that an exempt hospital can refuse treatment to nonemergency indigents and still remain exempt. We have found that the Association offers an open emergency room, has a subsidized dues program for the "near poor," and has provided some free care to the poor. It is clear that those latter services go far beyond the mere emergency room services offered by respondent's hospital A.

If the charitable hospital can, except for emergency cases, restrict its treatment to paying patients, the Association should be able to restrict itself to paying members. If the charitable hospital can obligate itself to treat only the financially responsible ill, the Association should be able to obligate itself to treat only the financially responsible, when and if they become ill. The main difference between the Association and hospital A is the time when they obligate themselves to provide health care services. The hospital can, in respondent's view, wait until the indigent patient needs hospitalization to refuse him treatment, but the Association cannot refuse the indigent person membership, and cannot commit itself to maintain the health of the nonindigent person *before* he is ill, without thereby providing "preferential treatment" resulting in private benefit to its members. In neither the case of the Association nor the hospital can the emergency patient be refused aid. In neither case can a refusal for admission be based on the applicant's race, creed, sex, etc.[14] If anything, the Association has a stronger claim to public

[13]We refuse the invitation of the parties to determine whether the "social welfare" standard of sec. 501(c)(4) is the same as the "public benefit" standard in sec. 501(c)(3). This case does not require such a dissection of the concept of "charitable."

[14]We note that there is no indication in the record, nor does respondent claim, that any applicant for fee-for-service treatment has been refused service. Indeed, this would not seem likely since fee-for-service income was anticipated to be a source of badly needed income for the Association—and could result in new membership applications. In this respect, again, the Association is similar to hospital A.

benefit than hospital A. Thus, we find that there is no substantial private benefit in the Association's organization or operation, and that the Association is organized and operated for an exempt charitable purpose.[15]

Respondent refers on brief to cases such as *United States v. La Societe Francaise De Bien. Mut.*, 152 F.2d 243 (9th Cir. 1945), cert. denied 327 U.S. 793 (1946); *Hassett v. Associated Hospital Service Corp.*, 125 F.2d 611 (1st Cir. 1942), cert. denied 316 U.S. 672 (1942); *Balt. Health & Welfare Fund v. Commissioner*, 69 T.C. 554 (1978), in support of "a long standing position of the Internal Revenue Service that organizations which furnish prepaid hospitalization or medical care on a cooperative or mutual basis are not charitable within the meaning of section 501(c)(3)." These cases are, for the most part, distinguishable on their facts. *Balt. Health & Welfare Fund v. Commissioner, supra,* concerned an organization whose primary purpose was to benefit the members of a particular union. The Court there found that "petitioner's activities consist of operating child day care centers and providing services for its *union* membership, *and, in addition,* providing physical examinations and immunizations for its members." (Emphasis added.) *Balt. Health & Welfare Fund v. Commissioner, supra* at 557. The Court also found that (1) the petitioner's child day care centers were primarily provided for its union membership, and (2) the petitioner spent 78 percent of its disbursements (most of its income consisted of payments from the union's members) to operate these centers. *Balt. Health & Welfare Fund v. Commissioner, supra* at 555–556. Clearly, the primary beneficiary of that petitioner was the union. The Court there found that the union constituted a class whose benefit was not the benefit of the community. We, on the other hand, have found that there is no meaningful limitation on Association membership, and that all Association members get equal services and benefits.

The next case, *United States v. La Societe Francaise De Bien.*

---

[15]We note that the Association might restrict its individual admissions to certain periods in the year, but do not find this to impose a substantial limitation on individual membership.

On brief, respondent makes much of the Association's "preexisting conditions limitation"—calling it *"patently inconsistent* with the community benefit standards of Rev. Rul. 69–545," and a "blatant indication of private benefit." We do not believe that the Association has to bankrupt itself to prove that it is "charitable" within the meaning of sec. 501(c)(3). A defunct charity can hardly help anyone.

*Mut., supra,* was organized and operated for the benefit of a certain ethnic group.[16] Thus, it too, involved an organization whose purpose was to benefit a particular group, membership in which was limited and selective. Further, a substantial portion of its income was from nonmembers. In the *Associated Hospital* case the court noted:

> The subscribers consider themselves neither charitable donors nor the recipients of charity. The corporate capital is not composed of charitable contributions but of fees exacted from subscribers. * * * Membership is not limited to the needy but as a matter of fact is composed largely of the middle class and well-to-do. * * * Such a corporation is not charitable. [*Hassett v. Associated Hospital Service Corp., supra* at 614.]

The court could find that the plaintiff served no purpose other than to pay the hospital bills of its subscribers.

Now, we come to respondent's second reason for refusing the Association's application for exemption: That the Association's operation is not in furtherance of a public charitable purpose because the effect of its prepayment feature "is to provide a form of insurance for your member-subscriber."

The respondent disclaims on brief any intent, by his reference in his determination letter to insurance, to indicate that he believes that petitioner is an insurance company for purposes of subchapter L. The respondent has, indeed, announced his belief that prepaid group practice plans are not insurance companies for purposes of subchapter L, Rev. Rul. 68–27, 1968–1 C.B. 315. But respondent points to the risk-spreading aspect of the Association's prepayment feature any says: "Without question, a substantial economic benefit is conferred upon the member under the prepayment plan in that the individual is permitted to limit the total costs that must be incurred in obtaining medical services by shifting the ultimate risk of loss to petitioner." This is certainly true. The Association's fees are set on a community-rating basis. These fees, as we have found, do not shift regardless of the amount of use, or the lack of use, to which each member puts the Association. Thus the risk of illness is spread throughout the entire membership. This is a substantial benefit. But we have already found that the potential class of members is not so limited that the community as a whole does not benefit

---

[16]Membership in the Societe was limited to those "of French birth, or descendents of French or speaking French, sound in mind and body, and less than 50 years old." *United States v. La Societe Francaise De Bien. Mut.,* 152 F.2d 243–244 (9th Cir. 1945), cert. denied 327 U.S. 793 (1946).

from the Association's operations. When possible membership is so broad, benefit to the membership *is* benefit to the community. The respondent has not cited a single case, ruling, or article in support of this ground for denying the Association section 501(c)(3) status. Some hint, however, as to the respondent's reasoning may be gleaned from his statement on brief that:

Although the availability of health insurance is a socially desirable end, the provision of insurance is a purely commercial function. Private, for-profit insurance companies provide many forms of health insurance, enabling individuals to limit their risks with respect to the cost of health-care services. The effect of petitioner's prepayment feature is to duplicate this commercially available service. Thus, this aspect of petitioner's operations does not serve charitable purposes.

The case of *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352 (1978), involved a section 7428 declaratory relief action. In that case a consulting service's application for section 501(c)(3) recognition had been rejected by the respondent. We said at page 358:

We must agree with the Commissioner that petitioner's activity constitutes the conduct of a consulting business of the sort which is ordinarily carried on by commercial ventures organized for profit, since the administrative record does not show otherwise and the burden was on the petitioner. Petitioner's stated research areas include, among others, "alternative" housing, "alternative" financing for small-scale entrepreneurs, solid waste management, and environmental impact program. Petitioner has completely failed to demonstrate that its own services, or the services performed by its consultants, are not in competition with commercial businesses such as personnel agencies, consulting referral services, real estate agents, housing rental services, banks, loan companies, trash disposal firms, or environmental consulting companies. [Fn. ref. omitted.]

But we also said in the same case at pages 356–357:

Under the operational test, the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization exempt from tax under section 501(a). * * * Rather, the critical inquiry is whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose, or whether its primary purpose is the nonexempt one of operating a commercial business producing net profits for petitioner. [Fn. ref. omitted.]

In *B.S.W. Group, Inc. v. Commissioner, supra,* we found that the organization therein involved was operating for commercial purposes. We have found the Association to be operating for

charitable purposes. The provision of business consulting services is not a charitable purpose, as is the provision of health care services. The argument that petitioner cannot be exempt because it is somehow in competition with commercial businesses is, hence, inapplicable.

The risk spreading feature of the Association's plan is irrelevant unless it can be shown to cause the forbidden private benefit. We have already found that such private benefit is not here present.

The petitioner has carried its burden. The Association should have been granted section 501(c)(3) qualification.

*Decision will be entered for the petitioner.*